UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILLIAM ROE, et al., on behalf of themselves
  and all others similarly situated,
                *Plaintiff,*

vs.

MICHAEL HOGAN, et al,
         *Defendant,*

Case No: H89 - 570 (PCD)


November 22, 2004


## EXHIBIT A.


### CERTIFICATION OF THE SERVICE

I, Patrick Arbelo hereby certify that a true copy of  Exhibit A was duly served by U.S. Mail, in accordance
with Rule 5 (b) of the Federal Rules of Civil Procedure, postage prepaid on this 22 nd, day of November
2004 to:

Thomas Ring,   Assistant Attorney General
55 Elm Street ,  P.O. Box 120
Hartford, Connecticut 06141 - 0120


                                            Mr. Patrick Arbelo
                              P.O. Box 351 Silver Street
                        Middletown, Connecticut, 06457


1

State of Connecticut
Department of Mental Health

# Report of the Ad Hoc Committee on the Insanity Defense

June 21, 1994

90 Washington Street • Hartford, Connecticut 06106

**APPENDIX K**

Report of the Ad Hoc Committee

on the Insanity Defense

## Table of Contents

Foreword. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Committee Membership. . . . . . . . . . . . . . . . . . . . . . . iii

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . v

Summary of Findings . . . . . . . . . . . . . . . . . . . . . . . 1

Connecticut's Insanity Defense Statute. . . . . . . . . . . . . . 5

The Psychiatric Security Review Board . . . . . . . . . . . . . 6

The Role of the Court . . . . . . . . . . . . . . . . . . . . . . 7

Defense Counsel's View of the Insanity Defense. . . . . . . . . . 9

The Prosecution's View of the Insanity Defense. . . . . . . . . . 11

A Mental Health Expert's View of the Insanity Defense . . . . . . 13

Management of Insanity Acquittees . . . . . . . . . . . . . . . . 14

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Foreword

The Ad Hoc Committee on the Insanity Defense was convened in January 1993 by the Commissioner of Mental Health, Albert J. Solnit, M.D., in light of public outcry over the escape of a patient who was confined to a mental hospital after being found not guilty by reason of insanity. Questions were raised as to both the legal rationale for the insanity defense itself and its specific implementation in Connecticut. The committee's task was to address these issues. The work of the committee was carried out by subgroups and by the committee as a whole. Committee members were selected to represent a wide range of constituencies, backgrounds and interests.

The committee undertook an examination of the insanity defense in Connecticut including: its history and frequency of use; the trial process; the characteristics of acquittees and their crimes; and the state's management of those individuals acquitted by reason of insanity.

In addition, the committee reviewed the authority and operation of the Psychiatric Security Review Board (PSRB), an independent administrative board created by the legislature and charged with protecting society through the monitoring of insanity acquittees.

The Department of Mental Health (DMH) conducted an individual assessment of 150 (88%) of the patients who were under the jurisdiction of the PSRB as of February 1993. These patients were placed at various settings including Whiting Forensic Institute (33%); DMH regional hospitals (42%); on community release (24%); and with DMR (.5%). The data derived through this assessment were merged with data maintained by the PSRB, the DMH Information Systems Division, the Judicial Department and the Law and Psychiatry Division of the Connecticut Mental Health Center, to provide the statistical basis for this report (unless otherwise indicated).

i

This report sets forth the committee's findings.  We hope that it will be use to the citizens of Connecticut, to the criminal justice system and to mental hea administrators and clinicians.

ii

## Committee Membership

**Chair**
**Albert J. Solnit, M.D.**
Commissioner of Mental Health

John Bailey, Esq., Chief State's Attorney
Represented by Judith Rossi, Esq., Assistant State's Attorney and
Steven Sellers, Director of Operations, Office of the Chief State's Attorney

Robert Berger, Esq., Chairman
Psychiatric Security Review Board

David Biklen, Esq., Executive Director
Connecticut Law Revision Commission

Mary Brackett, Ph.D.
Co-Chair, CAC 2, Department of Mental Health
Vice-Chair, State Board of Mental Health

Former Mayor Sebastian Garafalo
City of Middletown

David Hunter, Ph.D.
Director of Planning and Superintendent, Cedarcrest Regional Hospital
Department of Mental Health

Whitney Jacobs
Connecticut Alliance for the Mentally Ill

Karen Kangas, Ed.D.
Director of Consumer Education
Department of Mental Health

Kenneth Marcus, M.D.
Deputy Commissioner for Clinical Services
Department of Mental Health

Edward Mattison, Esq., Executive Director
Connecticut Legal Rights Project

Merilee Milstein
New England Health Care Employees Union

Garrell S. Mullaney, MHA, Superintendent
Norwich Hospital

Michael A. Norko, M.D., Director
Whiting Forensic Institute

Melodie J. Peet, MPH
Deputy Commissioner, Administrative
Department of Mental Health

Thomas Ring, Esq.
Assistant Attorney General

iii

Judge Robert Satter
Judicial Department
Hartford Superior Court

Deborah C. Scott, CISW
Director of Forensic Services
Department of Mental Health

Kenneth Selig, M.D., J.D.

Joseph M. Shortall, Esq.
Chief Public Defender

Susan Storey, Esq.
Office of the Chief Public Defender

The Honorable Richard Tulisano, House of Representatives, Connecticut General Assembl
  represented by Pamela Lucas, Esq., Office of Legislative Research

Howard Zonana, M.D., Director
Law & Psychiatry Division, Connecticut Mental Health Center
Yale University School of Medicine

Observers
The Honorable Susan Bysiewicz, House of Representatives, Connecticut General Assemb
The Honorable Terry Concannon, House of Representatives, Connecticut General Assembl
The Honorable Steven Mikutel, House of Representatives, Connecticut General Assemb

Staff
Elizabeth Omara-Otunnu, D.Phil., Former Director of Communications
Geraldine A. Roberts, Esq., Senior Executive Service Manager,
  Department of Mental Health
Robert Taylor, Director of Safety and Security,
  Department of Mental Health
Ivan Torres, Former Executive Assistant to the Commissioner
Eric Margolies, B.A., Executive Assistant to the Commissioner

iv

## Executive Summary

The insanity defense is used by the criminal justice system to individuali: punishment and to weigh criminal responsibility in specific cases. It is one of th rare circumstances in which an individual may not be held legally responsible fc criminal behavior but because of this behavior may be confined for treatment and th protection of self and society.

The integrity of the insanity defense demands that it be administered in a wa that balances the interests of society with the interests of the accused, and coincide with our values of fairness and justice. This report on the administration of th insanity defense in Connecticut reveals that it meets these requirements.

The findings of this report are a testament to the wisdom and foresight of the Connecticut General Assembly and Connecticut's criminal justice system. The insanit: defense statute in Connecticut has been narrowly construed, and clearly defines the limited group of offenders for whom the defense may be used. The General Assembly has continued to review and update the statute in response to advances in the understanding of mental illness and concerns about public safety.

In the criminal justice system the insanity defense is pleaded rarely. Wher pleaded, this defense is accepted by judges and jurors only a small fraction of the time. Each time this defense is used, the case is carefully examined by both prosecution and defense and there are procedural safeguards to assure that the defense is applied appropriately.

If the defense is successful, acquittees are placed under the jurisdiction of the Psychiatric Security Review Board (PSRB), which is charged with protecting society by monitoring both the treatment and security considerations involving insanity acquittees. Connecticut exercised foresight in establishing this autonomous,

v

administrative board to assure that persons acquitted by reason of insanity are closely supervised and that they are confined when they pose a risk to public safety. The Psychiatric Security Review Board in Connecticut plays a major role in the management of Connecticut's insanity acquittees. Although there have been several highly publicized cases involving insanity acquittees, the data shows that in Connecticut such cases are rare and that there is a well-defined system of accountability to assure that dangerous acquittees are securely confined.

The continued effectiveness and fairness of the administration of the insanity defense in Connecticut will depend on the continued active collaboration of all those concerned with the administration of justice and the treatment of persons with mental illness. To date this collaboration has enabled Connecticut to balance the need for humane treatment of persons with mental illness with the administration of justice and protection and safety of the public.

vi

## Summary of Findings

This section summarizes the Committee's findings in the context of stereotypes explored by the committee about persons found not guilty by reason of insanity. The figures presented were derived from the committee's study of 156 (88%) of the 17 acquittees under the jurisdiction of the Psychiatric Security Review Board as of February 1993 (unless otherwise noted).

### Stereotype 1

"Too many criminals plead insanity and are acquitted."

### Finding

In Connecticut, there are few successful insanity pleas. Although approximately 157,000 criminal cases are brought before a court each year, no record is kept of how many defendants attempt to use the insanity defense. However, records show that, on average, each year 15 people are acquitted by reason of insanity and committed to the Psychiatric Security Review Board. In Connecticut, as in the rest of the country, the defense is successful in less than one-tenth of one percent of criminal cases.

### Stereotype 2

"Most insanity acquittees are not really mentally ill, but are faking it."

### Finding

All the acquittees surveyed had a major mental illness and/or significant mental impairment. When evaluated immediately following acquittal, the overwhelming majority (75-80%) of acquittees had schizophrenia or some other very serious psychiatric

– 1 –

illness. Many in this group had additional diagnoses. The other 20-25% had significant impairment due to severe brain damage, personality disorder and/or mental retardation, often in combination with or complicated by substance abuse. Many in this group also had multiple diagnoses. Most acquittees respond to antipsychotic medications and other treatments for mental disorder. A few, however, are so ill that they do not respond consistently to any known treatment.

### Stereotype 3

"The insanity defense is a rich man's defense---if you can afford a high-priced lawyer you can 'get off' using an insanity plea."

### Finding

Most insanity acquittees are indigent. The "typical" acquittee is a white male in his early thirties who has completed high school. Despite the fact that many acquittees are high school graduates, most were unemployed at the time of the offense, perhaps because of severe and persistent mental illness.

### Stereotype 4

"Most insanity acquittees have committed violent acts against strangers."

### Finding

The victim of an acquittee is far more likely to be a family member or friend rather than a stranger. Three out of four of the violent crimes committed against others were committed against family, friends or acquaintances of the acquittee. Almost one in four acquittees was acquitted of a crime against property which did not involve violence against a person.

- 2 -

Stereotype 5

"Insanity acquittees pose a high escape risk."

Finding

No acquittees have ever escaped from Whiting Forensic Institute, Connecticut maximum security hospital. Escapes from the regional hospitals are rare. Records of the Psychiatric Security Review Board indicate that since the 1989 escape of an acquittee from a regional hospital that resulted in the murder of a young girl additional security measures initiated by the Department of Mental Health have been effective in reducing hospital escapes of acquittees. From July 1990 through June 1991 ten acquittees who did not require hospitalization in a maximum security facility escaped from regional hospitals--eight from the hospital itself and two while on community outings. Most escapees were returned within twenty-four hours, although one is still at large.

Stereotype 6

"Insanity acquittees will always be dangerous and need to be locked up for life."

Finding

A majority of acquittees, during the course of their commitment to the PSRB, are transferred out of maximum security based on a finding, due to their response to treatment, that they are not dangerous to an extent that requires hospitalization in a maximum security setting. Many (44%) are treated in regional psychiatric hospitals and earn privileges based on their behavior and response to treatment. Privileges are granted on the basis of systematically documented privileging criteria. Almost one in four (24%) are living in community-based settings under supervision, ordered and monitored by the PSRB.

- 3 -

### Stereotype 7

"Insanity acquittees are likely to commit the same crime again once released to the community."

### Finding

Acquittees who have been released from the hospital to the community, but remain under the supervision of the Psychiatric Security Review Board, are seldom re-arrested. From 1985, when the Psychiatric Security Review Board was established, through June, 1993, only three acquittees on community release were re-arrested. Records of the PSRB show that all were charged with minor crimes.

### Stereotype 8

"The insanity defense allows criminals to 'get off easy.'"

### Finding

Insanity acquittal and commitment to the Psychiatric Security Review Board may mean a lifetime of hospitalization and/or restricted personal freedom. Insanity acquittees usually serve their full term of commitment to the PSRB, unlike criminal offenders who are often released from prison before their sentence is completed. Because the charges are serious and are not reduced by plea bargaining, commitments are lengthy, an average of 27 years. Furthermore, the court may extend the commitment. At the time of the survey, the court had extended the commitment of 15 acquittees. The court had agreed to discharge only five acquittees before the end of their term of commitment.

- 4 -

## Connecticut's Insanity Defense Statute

Until 1967, Connecticut's insanity defense statute was a combination of the "knowledge of right and wrong test," i.e., the accused did not understand that the act was wrong and criminal, and the "irresistible impulse test," i.e., in committing the act the accused was overcome by an irresistible impulse arising from mental illness.

In 1967, the Connecticut General Assembly revised the statute to conform with the American Law Institute Model Penal Code test which more precisely combined the "right-wrong" and "irresistible impulse" tests. The statute was revised again in 1979 to prohibit the use of the insanity defense if the defendant's mental state was caused by the use of alcohol or drugs. In 1981, the statutory language was changed to "guilty but not criminally responsible." In 1983, this language was abandoned and the statute was further changed to place on defendants the burden of proving that insanity existed at the time of the offense. This change has resulted in all defendants being presumed sane unless the defense can prove otherwise.

The current law, Connecticut General Statute Section 53a-13(a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

The statute specifically excludes the following conditions from the insanity defense: "(1) a mental disease or defect proximately caused by the voluntary ingestion, inhalation or injection of drugs or alcohol, (2) "abnormality" manifested only by repeated criminal or otherwise antisocial conduct, and (3) pathological or compulsive gambling."

- 5 -

## The Psychiatric Security Review Board

In 1985, the legislature created the Psychiatric Security Review Board, independent authority charged with monitoring insanity acquittees. Section 17a-582 of the Connecticut General Statutes provides that the primary concern of the PSRB is the protection of society.

The PSRB is composed of five appointed members: a psychiatrist; a psychologist a probation/parole expert; an attorney; and a member of the community at large. All are appointed by the Governor with the advice and consent of one house of the General Assembly. The PSRB has the authority to order the confinement of an acquittee in public or private treatment facility for the protection of society. The acquittee must have the approval of the PSRB to leave the facility temporarily or to live in the community (conditional release). The PSRB may order termination of an acquittee's conditional release. When there is cause to terminate a conditional release, the Chair of the PSRB may execute an order, which has the full power of a warrant signed by a Superior Court judge, to have the acquittee immediately taken into custody by the police and placed in a treatment facility.

Reports must be filed every six months with the PSRB by those treating all acquittees. These reports are sent to the State's Attorneys' Office and to each acquittee's lawyer. In addition to the six-month report, the PSRB receives monthly reports on acquittees living in the community. The PSRB is required to hold a hearing to review the status of each acquittee at least once every two years. Other hearings are held when application is filed for a change in an acquittee's status.

PSRB hearings are adversarial proceedings. The state's interests are represented by the State's Attorneys' Office that originally prosecuted the acquittee's case. The acquittee is represented by counsel. Over 80% of the acquittees are indigent and are represented by the Office of the Public Defender. Victims must be notified of PSRB hearings, and may appear at hearings to make a victim impact statement.

- 6 -

### The Role of the Court

National studies consistently show that the insanity defense is seldom used and, when used, is usually not successful. In Connecticut, as in the rest of the country, the defense is successful in less than one-tenth of one percent of criminal cases.

Although no records are kept of the number of times that an individual offers the insanity defense in Connecticut, only fifteen of the 157,000 criminal cases brought each year result in the defendant being acquitted by reason of insanity.

In Connecticut, many successful insanity defenses are uncontested because the State's Attorney and his/her expert agree with the report furnished by the defense expert who has examined the accused. However, even when the defendant, the defendant's attorney and the prosecutor agree on the validity of the defense, there must still be a trial. The trial is usually held before a judge or panel of judges, rather than a jury. When the defense is uncontested, the issues are limited to establishing that the defendant committed the offense and to introducing the expert testimony supporting the use of the insanity defense.

If the defense is contested, opposing experts testifying for the state and the defense are cross examined at length concerning the bases for their opinions. Very few contested insanity defenses are successful. Judges and juries tend to hold individuals responsible for their behavior, particularly when there is disagreement among experts.

When the defense is successful, the acquittee is sent to Whiting Forensic Institute for an evaluation of the acquittee's mental status and dangerousness to self or others. Following this evaluation the acquittee is returned to court. Those who are found by the court to be no longer in need of confinement are released. Since the establishment of the PSRB, the court has released only one acquittee on the basis that the individual posed no threat to society.

- 7 -

Those found to be in need of supervision are committed by the court to the PS for a definite term. Commitments range from one year to life. The average term commitment is 27 years. Commitments to the PSRB tend to be lengthy because most cas involve multiple charges or very serious charges. Individuals found not guilty reason of insanity of multiple charges often receive consecutive "sentences" and a lo. term of commitment. In contrast, individuals found guilty of multiple criminal charg often receive sentences that run concurrently, often resulting in shorter periods confinement than those served by the insanity-defense acquittees.

Insanity acquittal and PSRB commitment means, therefore, that the insanit acquittee faces the possibility of being hospitalized or under strict communit supervision for much longer than if found guilty of a crime. Furthermore, regardles of the initial term of commitment to the PSRB, the commitment may be extende indefinitely by the court if the court finds that the acquittee remains in need o confinement for the protection of society. Fifteen commitments have been extended b the court; only five acquittees have been discharged from PSRB supervision before th end of their term of commitment.

- 8 -

## Defense Counsel's View of the Insanity Defense

There are a number of factors that may trigger defense counsel to consider entering an insanity defense:

* Unusual facts or circumstances of the offense charged.
* Prior psychiatric history of the accused.
* Observations of mental problems in the accused's behavior or demeanor.

The accused has final authority to decide whether or not to use the insanity defense. A principal consideration in the accused's decision is the potential consequence of longer confinement if the defense is successful.

When the decision is made to explore use of the insanity defense, the defense attorney's first step is to retain a mental health expert. The expert, usually a psychiatrist, examines the accused, the circumstances surrounding the offense, and any previous psychiatric records in order to reach a tentative conclusion as to whether the defense might be applicable.

The mental health expert must conclude that the defendant met the statutory test for insanity at the time the offense was committed and that none of the excluded conditions applied, namely, (1) a mental disease or defect caused by voluntary use of drugs or alcohol, or (2) an abnormality shown only by criminal or antisocial behavior, or (3) compulsive gambling. If the expert's report and the other available facts support use of the defense, the defense attorney files a motion notifying the court and the prosecution of the intent to rely on the defense.

Most insanity acquittees in Connecticut are indigent and are represented by the Office of the Public Defender. Following an acquittal the public defender continues to represent the acquittee. The public defender monitors the acquittee's progress in

- 9 -

treatment, files motions on behalf of the acquittee with the court and the PSRB an represents the acquittee at hearings before the court or the PSRB.

- 10 -

## The Prosecution's View of the Insanity Defense

The prosecutor usually does not address the insanity defense until notice is filed by the defendant of the intent to use the defense. Until then the defendant is presumed to have been sane at the time of the offense.

When notice is filed with the court, the defense must furnish the prosecutor with any written reports from mental health experts regarding mental or physical examination(s) of the accused. Upon receipt of the reports from the defense, the prosecutor reviews the contents and the conclusions reached. If the defense expert's reports seem credible and the other facts of the case support the defense, the prosecutor may decide not to oppose the defense. Usually such a decision is reached only after further research by the prosecutor and consultation with a mental health expert hired by the prosecutor.

If the prosecution does not oppose the defense, the court holds what is commonly referred to as a "stipulated" trial. In that proceeding the prosecution presents the factual circumstances of the crime and the evidence against the defendant, and the defense presents the testimony of its mental health experts. The court may then enter a judgement of not guilty by reason of insanity.

If the prosecution disagrees or has reservations about the defense expert's report, the prosecutor responds by contesting the issue. At trial the prosecutor focuses on evidence that the crime required complex thinking and/or planning; that at the time of the crime the accused exhibited the ability to distinguish right from wrong; that the accused appeared to witnesses to be coherent, oriented and acting in a rational manner; and/or that the accused had a strong motive to commit the crime. In addition, the prosecution usually calls its own mental health expert to rebut the opinion of the defense expert.

- 11 -

Throughout the proceedings, the prosecutor keeps the victim and victim's fam
informed about the status of the case.  If the insanity defense is successful and t
acquittee is committed to the PSRB, the prosecutor keeps the victim and the victi
family informed of the acquittee's progress through the mental health system.
prosecutor addresses security concerns about the acquittee raised by parties to t
case and is available to consult with the victim or family with regard to testimony
PSRB hearings.

- 12 -

## A Mental Health Expert's View of the Insanity Defense

Mental health professionals, who are usually forensic psychiatrists, evaluate defendants to determine whether the insanity defense is applicable and appropriate in relation to the specific act of which the defendant is accused. Only a very small number of defendants are found eligible.

It is worth emphasizing that when more than one expert evaluates the same defendant, there is usually agreement among them. Although there are cases where experts disagree, highly publicized court battles between experts are, in fact, extremely rare.

The forensic expert undertakes the challenging task of looking back and reconstructing the individual's mental state at the time of the crime. This retrospective analysis is made easier if the expert is able to examine the defendant close to the time of the arrest, is able to review contemporaneous records describing the defendant's state of mind, and is able to compare present symptoms with prior descriptions of the defendant's condition. The expert usually conducts a number of lengthy interviews with the defendant and interviews friends, relatives and employers of the defendant, as well as the victim and eyewitnesses to the crime when it is appropriate.

The evaluation may take several months to complete. As previously noted, many evaluations conclude that the insanity defense does not apply, either because the defendant does not have a mental illness, or because the defendant's mental illness did not interfere with the ability to understand his/her actions and to abide by the law.

— 13 —

## Management of Insanity Acquittees

The management of insanity acquittees demands equal attention to the issues of clinical care and public safety. The effort to balance the difficult requirements of this dual mandate is at the heart of any program for management of insanity acquittees.

Insanity acquittees, in contrast with other patients, are subject to a special set of legal and clinical requirements because of their legal status. For example, the clinical assessment of an insanity acquittee must include not only a description of the current mental status, but, when indicated, a detailed assessment of the current risk that the individual poses to society.

Treatment of insanity acquittees by the Department of Mental Health is governed by departmental policies and procedures, the statutory requirements and regulations of the PSRB, and by the provisions of a 1989 Federal District Court consent decree, resulting from a lawsuit brought by the Connecticut Civil Liberties Union on behalf of acquittees. This consent decree states that acquittees must receive individualized treatment appropriate to their clinical needs. While risk management must be integrated into the treatment process, the decree assures that acquittees are not denied treatment simply because of their legal status. Appropriate treatment includes rehabilitation, which in turn includes privileges that are granted based on the clinical progress and needs of the acquittee, taking into account the risk and safety factors associated with such treatment and rehabilitation.

The committee's study of 88% of the 178 acquittees under the PSRB's jurisdiction in February 1993 revealed that the "typical" insanity acquittee is a white (68%) male (84.6%) in his early thirties with at least a high school diploma (62.7%) who was unemployed (80.6%) at the time of the offense. At the time of this survey one-third of the acquittees were patients at Whiting Forensic Institute; almost half (42%) were patients at the DMH regional hospitals (Connecticut Valley Hospital, Norwich

- 14 -

Hospital and Fairfield Hills Hospital) and 24% were on conditional release to community. One was placed with the Department of Mental Retardation.

Diagnostically, most acquittees (75-80%) were found to have schizophrenia other serious mental illness (schizoaffective disorder, major affective disorde bipolar disorder, other psychoses), often in combination with another disorder. other 20-25% had multiple other diagnoses, such as a severe personality disorde brain damage or mental retardation, sometimes combined with a major mental illne Almost half the acquittees surveyed (47.4%) were currently carrying an additior diagnosis of substance abuse.

The insanity defense in Connecticut is not usually offered for minor crimes. T acquittees studied were acquitted of murder (37.1%); some other crime against a pers (i.e. attempted murder, assault, sexual assault, kidnapping) (39.2%); crimes again property not involving a person (i.e. arson, forgery) (23.8%). The average term commitment to the PSRB was 26.6 years.

There have been no escapes by acquittees from Whiting Forensic Institute, t state's maximum security psychiatric hospital. Records of the Psychiatric Securi Review Board show that from February, 1987 to August, 1989 seventeen acquittees escap from DMH regional hospitals. All but one were apprehended within a matter of hour One of the seventeen escapes resulted in the killing of a young girl, Jessica Shor by an escaped acquittee, David Peterson. This took place in 1989 on a main street Middletown. In response to this tragic, violent event, additional security procedur at the regional hospitals resulted in a drop in the number of escapes. From July 19' through June 1993 ten acquittees escaped from regional hospitals; eight from t hospital itself and two from community outings. Again, all but one were returned the hospital, usually within a short period of time.

Insanity acquittees are initially hospitalized at Whiting Forensic Institute, t maximum security hospital for both men and women. If the patient shows clinical

- 15 -

improvement, the PSRB may approve transfer to a regional hospital, where some acquittees will begin preparation for eventual release to the community.

The process of community re-entry is strictly monitored by the PSRB and i approved only when an acquittee's progress justifies release to the community. Community re-entry must be seen by the PSRB as consistent with and in the service o the acquittee's treatment plan, as well as taking into account appropriate risks and safety factors.

Community re-entry is accomplished on a gradual basis. The acquittee must first receive permission for a highly restricted temporary leave from the hospital. If the acquittee is cooperative with the treatment and demonstrates continued stability and responsible behavior, the PSRB may expand the privileges granted under temporary leave status. Discharge from the hospital and release to the community is granted by the PSRB only to those acquittees who have established a long-term record of functioning safely in the community.

Even when the acquittee is discharged from the hospital and released to the community, the acquittee remains under the supervision of the PSRB and may be immediately returned to confinement if any conditions of the release are violated. If an acquittee on release to the community must be hospitalized, this can be accomplished within a matter of hours by the PSRB. Acquittees in the community remain under the supervision of the PSRB until their term of commitment ends or they are discharged by the court because the court finds the acquittee no longer needs supervision.

The Department of Mental Health and the Psychiatric Security Review Board cooperate closely in the management of Connecticut's insanity acquittees. The Psychiatric Security Review Board has statutory responsibility for protecting society by monitoring acquittees. The Department of Mental Health is responsible for providing treatment and risk assessment; informing the PSRB if an acquittee becomes a risk to

- 16 -

public safety or violates the conditions of confinement, treatment, temporary leave conditional release; and providing regular reports to the PSRB on each acquittee.

In order to meet the PSRB mandate to protect society, the Chair or Acting Chair of the PSRB is available around the clock to decide (1) whether an acquittee conditional release needs to be rehospitalized due to a change in mental status or violation of conditional release; (2) to carry out its statutory mandate to notify victims in case of the escape of an insanity acquittee; or (3) to provide consultation to the Department of Mental Health or other providers of mental health services on issues related to acquittee risk management.

The Executive Director of the PSRB provides systematic training to DMH clinical and administrative staff, works with DMH to establish uniform procedures for managing acquittees, and has provided a comprehensive manual for community providers of services to acquittees.

In addition to training provided by the PSRB, the Department of Mental Health provides ongoing specialized forensic training for hospital and community mental health staff caring for patients committed to the PSRB. Psychiatrists from the Division of Forensic Services are available in each DMH district to provide on-site training and consultation and to assist hospital and community staff in making risk management decisions concerning insanity acquittees.

- 17 -

## Conclusion

The administration of the insanity defense in Connecticut has been both judici and humane. Those responsible for its administration and the subsequent monitoring acquittees have been progressive in their outlook, but conservative in their actio. The interests of the people of the state have been well protected.

We believe, however, that the "public perception" of the insanity defense may quite different from the reality. We suggest, therefore, that the Department of Ment Health, the Psychiatric Security Review Board, and the criminal justice syst cooperatively develop a program of public education to dispel the myths surrounding t use of the insanity defense discussed in the "Summary of Findings" at the outset this report.

- 18 -