UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM ROE, *et al.*, on behalf of themselves and all others similarly situated<br>    *Plaintiffs*,<br><br>v.<br><br>MICHAEL HOGAN, *et al.*<br>    *Defendants*. | 2:89-CV-00570 (KAD)<br><br><br><br><br><br><br>OCTOBER 25, 2019 |

## MEMORANDUM OF DECISION
## RE: MOTION FOR COMPLIANCE (ECF NO. 168)

Kari A. Dooley, United States District Judge

Pending before the Court is the motion for compliance filed by Anthony Dyous on June 10, 2019. (ECF No. 168.) For the reasons stated herein, Dyous' motion is found as MOOT in part and otherwise DENIED.

**Procedural History**

On August 31, 1989, patients committed to the jurisdiction of the Connecticut Psychiatric Security Review Board ("PSRB") filed this class action lawsuit against various Commissioners of the Department of Mental Health and Addiction Services.[1] "The class alleged violations of: (1) their right to appropriate medical and psychiatric treatment, (2) right to be free from unnecessary restraint, (3) their right not to be deprived of their liberty without due process of law, and (4) their right not to be discriminated against because of their mental handicap as guaranteed by the First and Fourteenth Amendments of the United States Constitution." *Roe v. Hogan*, No. 2:89-cv-00570 (PCD), 2005 WL 8167655, at *1 (D. Conn. Sept. 30, 2005).

---

[1] This matter was originally pending before the Honorable Peter C. Dorsey. It was transferred to the undersigned for all further proceedings on June 13, 2019. (ECF No. 167.)

In December of 1990, the parties settled the claims through the entry of a consent decree (the "Decree"), which remains in full force and effect today. The stated purpose of the Decree is to ensure that PSRB patients are not "denied access to appropriate therapeutic, recreational, rehabilitative or leisure activities which are available to other patients solely because of the patient's commitment to the PSRB." (Decree at ¶ 11.) It recognizes that "[a]ppropriate psychiatric treatment requires that patients be given increasing levels of freedom and responsibility consistent with their individual clinical status." (*Id.* at ¶ 12.) It further requires that decisions concerning the care and treatment of PSRB patients be made "only after an individualized evaluation and assessment of each patient which explicitly considers and documents the patient's mental status and degree of danger, if any." (*Id.* at ¶ 13.) To that end, the Decree sets forth several policies and procedures designed to ensure that PSRB patients are treated on an individualized basis and in a manner that is least restrictive on their freedom. (*See generally id.* at ¶¶ 15, 17–21.)

The Decree also contains an enforcement provision, which permits plaintiffs to initiate proceedings in this Court to seek compliance with the Decree's terms. (*Id.* at ¶ 29.) Dyous is currently committed to the jurisdiction of the PSRB and resides at Dutcher Enhanced Security Service ("Dutcher") at Whiting Forensic Hospital ("Whiting"). (Mot. for Compliance at 1; T. Wasser Aff. at ¶ 4, ECF No. 169-1.)

**Discussion**

A consent decrees establishes legally binding responsibilities among parties. "Consent decrees are a hybrid in the sense that they are at once both contracts and orders, they are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.2d 1556, 1567–68 (2d Cir. 1985) (citations omitted). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate

the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. . . . For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971).

Nevertheless, "[s]ince a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the 'four corners' rule of *Armour*." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) (footnote omitted).

Here, Dyous contends that the Defendants are violating the Decree by (1) denying him Level 4 pass privileges,[2] (2) banning internet and e-mail access at Dutcher; (3) banning the use of cell phones and tablets at Dutcher, and (4) not providing an "appropriate venue for adult consensual relations to take place" at PSRB and Whiting facilities. (Mot. for Compliance at 3.) The Defendants respond that the first claim is moot because, as of July 2019, "Dyous now has a Level

---

[2] In his reply brief, Dyous amends this claim to also challenge the Defendants' practice and policy of consulting with the PSRB in connection with the issuance of such passes.

3

4 pass." (Defs.' Response Mem. at 1, ECF No. 174.) They further assert that the PSRB's involvement in the issuance of such passes is both appropriate, and in some circumstances, required. (*Id.*) The Defendants also argue that the bans on e-mail, electronic devices, and consensual relations (collectively, the "Bans") further legitimate safety and privacy interests and, in any event, are not matters addressed in or covered by the Decree. (Defs.' Opp. Mem. at 4–6, ECF No. 169.)

**Level 4 Pass**

As indicated, Dyous asserts that the Defendants are violating the Decree by denying him a Level 4 pass; (Mot. for Compliance at 3); and by "consulting, coordinating, notifying or requesting permission from the PSRB" when granting Level 4 pass privileges; (Mov.'t Reply Mem. at 8, ECF No. 173; *see also id.* at 1–2.)

By way of brief background, a PSRB patient's treatment team sets his or her privilege level. (T. Wasser Aff. at ¶ 5.) A Level 4 pass permits unsupervised trips into the community. (Defs.' Opp. Mem. at 3.) Although the treatment team sets the pass level, the PSRB sometimes requests to be informed in advance of Whiting's intention to grant a Level 4 pass to a particular patient. (T. Wasser Aff. at ¶ 5.) In response to that notice, the PSRB may then choose to hold a status review hearing on the patient's progress. (*Id.*) After such a hearing, the PSRB may decide remand the patient back to Whiting's Maximum Security Service or to permit the patient to remain at Dutcher. (*Id.*) If the patient remains at Dutcher, the PSRB cannot set the pass level. (*Id.*)

At the time of the filing of his motion, Dyous had only a Level 3 pass, which permits trips into the community with staff supervision. (*Id.*) Dyous had twice requested a Level 4 pass, but both applications were denied. (*Id.*) The Medical Director of Whiting represents that the most recent request was denied because Dyous "needed to demonstrate greater and consistent safety in

4

the community by making additional trips into the community with staff on his level 3 pass." (*Id.*) By June 2019, and after the filing of the instant motion, Dyous "had several community trips in which he demonstrated such behavior that his treatment team and the [Forensic Review Committee]" supported a Level 4 pass. (*Id.*) Because the PSRB had requested to be informed in advance of Whiting's intention to grant Dyous a Level 4 pass, Whiting informed the PSRB of this decision. (*Id.*) In July 2019, Dyous was given a Level 4 pass.[3] (Defs.' Response Mem. at 1.) The PSRB has been so advised, but it is unknown what, if any, action the PSRB might take in response. (*Id.*)

As a threshold matter, the Court agrees that Dyous' motion is moot to the extent that it seeks to compel issuance of a Level 4 pass. "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (alterations omitted; citations omitted; internal quotation marks omitted); *accord Powell v. McCormack*, 395 U.S. 486, 495–96 (1969). Here, because Dyous has been given a Level 4 pass, there is no effectual relief that this Court can provide on this issue. *E.g.*, *Roe v. Hogan*, No. 89-cv-00570, ECF No. 110, at 1–2 (D. Conn. May 1, 2007) (finding as moot movant's request for order of compliance where movant "is no longer subject to the Dutcher 2 South policy/program which he challenges").

---

[3] The Defendants notified the Court of this development through what it styled as a "Reply Memorandum in Opposition to Motion for Compliance." (ECF No. 174.) Dyous objected to this filing as an improper sur-reply brief and asked that it be stricken. (ECF No. 175.) Dyous is correct that leave of the Court is required for sur-reply briefs. D. Conn. Local R. Civ. P. 7(d). But "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Here, the Defendants merely sought to notify the Court of a factual development. Even if the submission was considered an improper sur-reply, the Court will overlook the Defendants' failure to comply with the procedural requirements of Local Rule 7 and allow it because this factual development is germane to the Court's mootness determination.

5

Dyous also contends that Dutcher's practice and policy of communicating with the PSRB in connection with the issuance of Level 4 passes violates the Decree's requirement that PSRB patients be provided with "clinically appropriate, individualized treatment." (Mov.'t Reply Mem. at 1.) Dyous is incorrect. Nothing in the Decree prohibits treatment facilities from consulting or communicating with the PSRB about leave privileges. To the contrary, the Decree expressly contemplates that the PSRB will be consulted concerning temporary leave, unconditional discharge, and other unsupervised privileges. (Decree at ¶ 14 ("It is expected that hospitals . . . will provide to the PSRB thorough and comprehensive descriptions of . . . its requests for temporary leaves and conditional discharge."); *id.* at ¶ 15.a. ("Temporary leaves shall be granted to all patients who have received such authorization from the PSRB"); *id.* at ¶ 15.b.iv. (stating that the master treatment plan must include "a description of the particular services and programs which are adequate and appropriate . . . consistent with the patient's needs and least restrictive of his/her freedom, recognizing the role of the PSRB in authorizing temporary leaves and conditional discharges"); *id.* at ¶ 15.e ("Nothing in the preceding paragraphs shall prohibit the treatment team from granting, when clinically appropriate, unsupervised on-campus privileges. . . , unless otherwise requiring the approval of the PSRB.").) The Decree, as one would expect, is also consistent with Connecticut law, which requires treatment facilities to apply to the PSRB for an order authorizing temporary leave and conditional release. Conn. Gen. Stat. § 17a-587(a) (temporary leave); Conn. Gen. Stat. § 17a-588(a) (conditional release). Accordingly, because this practice does not violate the Decree, the Motion for Compliance is denied as to this issue.

**The Bans**

Dyous also asserts that the Bans violate the Decree. The Defendants respond that the Bans serve legitimate safety and privacy interests and are not covered by the Decree, in any event. The Court agrees.

As explained by the Medical Director of Whiting, each of the Bans apply to all patients at Whiting facilities and are not limited to PSRB patients. As noted above, the purpose of the Decree is to ensure that PSRB patients are not "denied access to appropriate therapeutic, recreational, rehabilitative or leisure activities *which are available to other patients* solely because of the patient's commitment to the PSRB." (Decree at ¶ 11 (emphasis added).) As such, restrictions applicable to all patients were not implicated by the concerns raised in the underlying litigation and are accordingly not included in the Decree. Indeed, a review of the entire Decree reveals that nothing therein prevents mental health facilities from adopting these types of facility-wide policies to protect the safety and privacy of patients and staff.

Moreover, the Medical Director of Whiting has identified specific safety and privacy interests as mandating these restrictions. (T. Wasser Aff. at ¶¶ 6–8.) Whiting bans the use of e-mail because it is not feasible for staff members to monitor patient e-mail accounts to ensure that patients are making only appropriate e-mail contacts with other patients, staff, and the public. (*Id.* at ¶ 6.) "By statewide policy, no in patients [sic] at Connecticut state mental health institutions are allowed cellphone or tablets because such devices would allow inappropriate email usage and enable photographing, videoing and audio recording" of the user patient as well as other patients at the facility, which could implicate state and federal laws governing patient confidentiality and the confidentiality of patient medical records. (*Id.* at ¶ 7.) Finally, Whiting does not provide private locations for sexual activities for several reasons, including concerns about patients' ability

7

to consent, the "risk of false accusations of sexual misconduct and unwanted physical contact," and the possibility that patients who have been the victims of sexual assault or trauma could be re-traumatized. (*Id.* at ¶ 8.)

**Conclusion**

For these reasons Dyous' Motion for Compliance is found as MOOT in part and is otherwise DENIED. The motion is moot to the extent it seeks to compel issuance of a Level 4 pass. The motion is denied in all other respects.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of October 2019.

                                  */s/ Kari A. Dooley*
                                  KARI A. DOOLEY
                                  UNITED STATES DISTRICT JUDGE