## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM ROE, et al., on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Civil Action No. 2:89-cv-00570 (KAD) |
| v. | |
| MICHAEL HOGAN, et al., | June 3, 2021 |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTINO FOR TEMPORARY RESTRAINING ORDER

### I.      INTRODUCTION

Plaintiffs, by and through their counsel of record, respectfully file this Memorandum of

Points and Authorities and the attached Appendix and supporting declarations and exhibits

attached thereto, in support of their Motion for a Temporary Restraining Order (TRO) asking this

Court for a temporary restraining order to prevent likely and imminent irreparable harm resulting

from Defendants' noncompliance with the Consent Decree in *Roe v. Hogan*, Civ. No. H89-570

(PCD), Agreement of Settlement, December 5 1990 (Order or Consent Decree), attached as

Appendix 1.

### II. OVERVIEW OF THE *ROE V. HOGAN* CONSENT DECREE

In 1990, Defendants entered into a permanent Consent Decree in this case.  The Plaintiff

Class included the named plaintiffs and "all present and future PSRB [Psychiatric Security

Review Board] patients confined in state mental health inpatient facilities."[1] Order at ¶2. Among

the various provisions of the Consent Decree that are relevant to this Motion include the

requirement that "[a]ll decisions concerning the care and treatment of PSRB patients shall be

made on the basis of individual evaluations and assessments." Order at ¶11. Additionally, the

Decree states:

> The DMH hospitals are also responsible for insuring [sic] that decisions concerning the
> care and treatment of PSRB patients are made *after* explicit, individualized consideration
> of their history, the course of their disability, their current mental status, and a
> determination of whether participation in any particular program or activity will pose a
> danger to the patient or others. PSRB patients shall be provided with appropriate care and
> treatment which has its goal the restoration of the patient to, or maintenance of the patient
> at his/her highest level of functioning, . . . In this regard all treatment decisions
> concerning PSRB patients shall be made only *after* an individualized evaluation and
> assessment of each patient which explicitly considers and documents the patient's mental
> status and degree of danger, if any.

Order at ¶ 13 (emphasis added).

The Order also provides that "[e]ach patient shall be allowed and encouraged to fully

participate in person in the development of his/her treatment plan[,] . . . the opportunity to fully

participate in the treatment planning process, and the right to express written approval or

disapproval of the treatment plan . . ." *Id*., ¶15(b)(ii); *see also* ¶ 17 (applying the same rights to

periodic treatment team and plan review provided under ¶15(b)(ii) of the Order). Additionally,

under this section of the Order any "substantial modifications to the treatment plan will not be

made . . . without the participation of the patient except in emergency circumstances where the

condition of the patient is of an extremely critical nature as that term is referenced in C.G.S., §

---

[1] The Plaintiff Class in *Roe* under the Consent Decree is defined to include "the named plaintiffs and all
present and future PSRB patients confined in state mental health inpatient facilities." Consent
Decree at ¶ 1. A "PSRB patient" is defined as "any person who has been acquitted of criminal charges by reason of
mental disease or defect pursuant to C.G.S. § 53a-13 and who is committed to the Psychiatric Security Review
Board pursuant to C.G.S. § 17-257, *et seq.*" (now codified at 17a-580).

17-206(d)(c)."[2]

Under II.15(b)(iv), the Order requires that the patient's treatment plan include:

1) a statement of the patient's needs in terms of assessed strengths and weaknesses;
2) long-range goals and short-term treatment objectives, stated in specific and measurable terms with timelines; 3) a description of the particular services and programs which are adequate and appropriate, and the location and frequency thereof, consistent with the patient's needs and least restrictive of his/her freedom, recognizing the role of the PSRB in authorizing temporary leaves and conditional discharges; 4) a description of the methods by which such services are provided, including designation of the person(s) responsible, monitoring, review, and documentation of the actual provision of such services.

Order at ¶ 15.b.iv.

Additionally, under paragraph 15.c of the Order, "[i]ndividualized psychiatric, therapeutic, rehabilitative, vocational, recreational and leisure programming shall be provided to each patient in accordance with the master treatment plan." Order at ¶ 15.c.

The Decree also states that if Plaintiffs believe that Defendants are in non-compliance with the Agreement, they will inform Defendants of such in writing and give them ten days to remedy the problem. During this period, the parties will make reasonable efforts to resolve the issues through negotiations. *Id.* at ¶ 29. If the parties cannot reach a resolution, Plaintiffs may initiate proceedings with the Court to seek compliance with the Consent Order. *Id.*

As explained herein, Defendants failed to comply with these requirements when they adopted and implemented their plans to merge WFH Units 4 and 6 and to transfer some of the other patients from these units to other WFH units including competency restoration units. Plaintiffs have attempted to resolve the matter using the dispute resolution process set forth in the Decree, but were unsuccessful; therefore, they have filed a Motion for Compliance and their Motion for a Temporary Restraining Order. See Dorfman Decl., ¶ 8, Exh. 7.

---

[2] This provision is now codified at C.G.S. § 17a-543.

### III.    STATEMENT OF FACTS

*A.  Overview & Procedural History*

The affected individuals in this case all reside at WFH and are committed to the custody of the PSRB and therefore are all members of the Plaintiff Class in the above-captioned action. *See* Declaration of Susan Werboff  in Support of Plaintiffs' Motion for Compliance and Plaintiffs' Motion for Temporary Restraining Order (Werboff Decl.), ¶¶ 2-3; Declaration of Chris Craigwell  in Support of Plaintiffs' Motion for Compliance and  Plaintiffs' Motion for Temporary Restraining Order (Craigwell Decl.) ; ¶¶ 2-5; Declaration of Thomas Connors in Support of Plaintiffs' Motion for Compliance and Plaintiffs' Motion for Temporary Restraining Order (Connors Decl.), ¶¶ 2-3, 12; Declaration of Stephen Morgan in Support of Plaintiffs' Motion for Compliance and  Plaintiffs' Motion for Temporary Restraining Order (Morgan Decl.), ¶¶ 2-5; and Declaration of Hal Bassow in Support of Plaintiffs' Motion for Compliance and  Plaintiffs' Motion for Temporary Restraining Order (Bassow Decl.) ¶¶ 2-5; and Declaration of David McKeever in Support of Plaintiffs' Motion for Compliance and  Plaintiffs' Motion for Temporary Restraining Order (McKeever Decl.) ¶¶ 2-3.

As described more fully below, on May 17, 2021, WFH front-line Forensic Treatment Specialists (FTS's) suddenly announced to the patients residing at Unit 6 of WFH that the Unit was being closed due to staff shortages and census issues. Bassow Decl. ¶ 6; Morgan Decl. ¶ 5; Craigwell Decl. ¶ 6.[3] The WFH staff also at that time announced that most of the patients from Unit 6 would be forced to move to another unit at WFH—Unit 4, and that the rest would be

---

[3] Although Defendants have stated that the closure of Unit 6 is "temporary" and that they would re-open it when the census of WFH Maximum Security Service reached the 80th patient, which they estimated to be within the next two to three months, they said they could not be certain when they could re-open the unit.

moved to other units at WFH including units that are designed for the care and treatment of individuals found incompetent to stand trial and receiving competency restoration treatment. *See* Bassow Decl., ¶ 6; Craigwell Decl., ¶ 6; Morgan Decl., ¶ 5.  Likewise, the patients on Units 4 and 6 were formally notified of the merger of Units 4 & 6 at a community meeting of patients on May 19, 2021. Connors Decl. ¶ 4, McKeever Decl. ¶ 6.  The conservator for one of the Unit 6 patients, Plaintiff Anthony Henry, was not notified of the plan until May 25, 2021, when she was informed *via* telephone by a WFH social worker.  There was no discussion or input solicited of Mr. Henry's conservator by WFH staff or administration regarding the plan. Werboff Decl., ¶ 4. Mr. Henry's conservator was not informed that Mr. Henry had moved until after the fact *via* an email to her on May 26, 2021. *Id.*, ¶ 10.

On May 24, 2021, Disability Rights Connecticut (DRCT) and Connecticut Legal Rights Project (CLRP), on behalf of the Plaintiffs, wrote an urgent letter to Defendants which outlined their serious concerns about the current and ongoing staffing shortages at WFH and the immediate risk of harm that these shortages imposed on the patients. Dorfman Decl., ¶ 2. Of particular note in the letter was DRCT's and CLRP's concern about the likely harm caused by WFH's plan to consolidate WFH Units 4 and 6 by closing Unit 6 and transferring most of them to Unit 4 and putting a few others on competency restoration units. *Id*. In their letter, DRCT and CLRP asked the Defendants to agree to take certain remedial steps, including but not limited to withdrawing their plans to transfer the patients and close Unit 6.  In the letter, DRCT and CLRP also requested that Defendants meet with them to discuss the matter and to try to resolve the issues.  *See id.*

In the afternoon of May 25, 2021, CLRP Legal Director, Kirk Lowry, sent an email to Department of Mental Health and Addiction Services' (DMHAS) Agency Legal Director

5

inquiring about the status of any response to DRCT and CLRP's letter of May 24.  Dorfman

Decl., Ex. 1. In that email, Attorney Lowry explained that he had been informed by one of the

doctors at WFH earlier that day that despite Plaintiffs' letter, Defendants were proceeding with

their plan to merge Units 4 and 6 and transfer the patients accordingly.  Attorney Lowry

explained that in light of this information, CLRP and DRCT would proceed to file a non-

compliance motion in *Roe* and an accompanying motion for a temporary restraining order. *Id.*

Later, on May 25, 2021, Defendants sent two virtually identical letters—one to DRCT

and the other to CLRP—acknowledging receipt of the May 24th letter and stating that they would

contact DRCT and CLRP to set up a meeting at an unspecified time "in the very near future."

Letter from Joseph Crego to Deborah Dorfman, DRCT, attached to Dorfman Decl. as Exh. 2 and

Letter from Joseph Crego to Kathy Flaherty, CLRP, also attached as Exh. 2 to the Dorfman Decl.

Soon thereafter, on May 25, 2021, DRCT and CLRP each sent virtually identical

responses to Mr. Crego's letter again stating that they would be happy to meet with Defendants

but would be pursuing a compliance action under the *Roe v. Hogan* Consent Decree because

Defendants had not agreed to withdraw the unit merger plan.  *See id.*, Exhs. 3 & 4.

In response, Defense Counsel sent an email to DRCT and CLRP on May 27, 2021,

acknowledging receipt of CLRP's email, stating a willingness to meet, but not responding to

Plaintiffs' request to stop the transfers and send a patient who, at that point, had already

transferred to Unit 4, back to Unit 6. *See id.*, Exh. 5.   DRCT and CLRP jointly responded that

same day reiterating the timeline of events, their position that the proposed unit transfer plan

violated the terms of the *Roe* Order, our intent to file a motion for compliance, an outline of the

specific sections of the Order that would be violated if DMHAS moved forward with the plan,

Plaintiffs' willingness to meet to discuss the situation, and our request that the transfers stop

while such discussions were taking place, and suggesting a time for such a meeting on the morning of June 1, 2021. *See id.*, Exh. 6. Defense Counsel responded *via* email that the proposed date and time would not work for the Department, but proposing a meeting on June 2, 2021, at 3:30 pm. CLRP and DRCT jointly replied that they would be available at that time to meet and reiterated our request that the transfers stop while such discussions were pending. On June 1, 2021, Plaintiffs' Counsel received confirmation from Defendants of the meeting set for June 2, 2021, but still received no response that Defendants stay their unit merger plan. Later that day, the Plaintiffs learned that at least two more Class Members had been transferred from Unit 6 to Unit 4.

The parties met on June 2, 2021, to discuss the issues raised by Plaintiffs with respect to Defendants' noncompliance with the *Roe* Order and related urgent issues set forth in their May 24, 2021, letter. The parties were not able to resolve the matter. *See* Dorfman Decl., ¶ 8, Ex. 7.

B. *Inadequate Staffing and Concomitant Risk of Physical Assault and Lack of Individualized Treatment*

1. <u>Defendants Plan to Relocate Patients on WFH Unit 6 to Other Treatment Units Is for Administrative Convenience and Disregards Individual Clinical Needs.</u>

WFH is understaffed. *See* Decls. of Morgan, ¶ 5; Craigwell, ¶ 6; Bassow, ¶ 6; Connors Decl., ¶ 4; McKeever Decl., ¶6. In order to address its chronic understaffing problems, Defendants have decided, in part, to close one of its units—Unit 6 at the maximum-security building at WFH (Unit 6)—and transfer most of the patients from Unit 6 to Unit 4, and transfer some patients to other units, including competency units, at WFH. Declaration. *See* Connors Decl., ¶ 4; Bassow Decl., ¶ 6; Craigwell Decl., ¶ 6; Morgan Decl., ¶ 5; *see also* Werboff Decl., ¶ 4; McKeever Decl. ¶ 6. Defendants transferred at least one patient from Unit 4 to a competency unit. *See generally* Connors Decl. Specifically, the patients on Units 4 and 6 were notified by

line staff of this impending move on May 17, 2021, and then at a "community meeting" during which the Acting Chief Operating Officer, Joseph Crego, informed the patients of the move and that the reason for this move was due to staff shortages and a reduced census at WFH. Connors Decl., ¶ 4; Bassow Decl., ¶ 6; Craigwell Decl., ¶ 6; Morgan Decl., ¶ 5; Werboff Decl., ¶ 4, McKeever Decl., ¶ 6.  The decision was not based upon the Plaintiffs' individual clinical needs, but rather administrative needs of the hospital; the patients and/or their legal representatives were not permitted any input into this decision. Craigwell Decl., ¶¶ 6, 9, 10, 11, 13; Morgan Decl., ¶¶ 5, 8-12; Werboff Decl., ¶¶ 4, 7, 10- 11, 15; Bassow Decl., ¶¶ 6, 9, 10, 12, 16; Connors Decl, ¶¶ 4, 7, 8, 9, 13; McKeever Decl. ¶¶7, 9-11.  The Plaintiffs had no opportunity to discuss the proposed move with their treatment teams.  Although they informed the Plaintiffs that the transfer would go into effect on June 1, 2021, Defendants have already started this process. *See* Decls. of Connors, ¶ 11 and Werboff, ¶ 10.  Defendants have already moved at least four of the patients: Anthony Henry, Thomas Connors, Stephen Morgan, and one other patient. *See id.* Consequently, as discussed below, the merger of the patients from Unit 6 with those on Unit 4 and the movement of other patients to other units to administratively address the ongoing understaffing at WFH places the Plaintiff Class at risk of irreparable harm including risk of physical assaults, decreased physical space, and lost opportunities for active treatment as well as participation in activities such as recreational and leisure activities.

      *a.   Immediate Risk of Patient-to-Patient Assault*

      Defendants have not sufficiently evaluated and considered the individual treatment implications of merging the Unit 6 patients with Unit 4 patients into one unit or transferring other patients to competency units before taking these actions. First, there was no sufficient evaluation of each patient's risk factors and treatment needs as they relate to being moved from Unit 6 to

Unit 4 or to other units or from Unit 4 to other units, prior to their move to the new units and Defendants' implementation of their plan. *See e.g.*, Werboff Decl., ¶¶ 7, 10, 11, 15; *see also* Morgan Decl., ¶¶ 5,10, 12; Bassow Decl., ¶¶ 6, 9, 12, 15, 16.  The hospital's plan to address such risk by placing patients that have a protective order, a prior assault, or a current threat, on a competency restoration unit at WFH, is insufficient.  Individualized assessments to determine whether the Plaintiffs have any risk factors that would place them at risk of physical assault if moved are necessary. Evaluation of each patient's current risk is essential prior to any move so as to avoid placing patients who are particularly vulnerable with patients who have problems with aggression. Consequently, as a result of the unit merger, some patients with histories of physical altercations with each other will be housed together on the merged unit. Morgan Decl., ¶ 12; Bassow Decl., ¶¶ 9, 14, 15; McKeever Decl., ¶ 13.  For example, Plaintiff Class Member, Hal Bassow, a patient with PTSD who is committed to PSRB, who lives on Unit 6, was initially placed there, in part, because of conflicts he had with some of the patients who live on Unit 4. Bassow Decl., ¶¶14-15.  As a result of these conflicts, he was traumatized. *Id*., ¶14. Because of the impending merger, Mr. Bassow is now slated to move back to Unit 4 and will be reunited with the very patients with whom he has ongoing conflicts and from whom it was clinically determined that he should be separated. Bassow Decl., ¶¶ 14-15. Mr. Bassow fears for his safety and wishes to stay on Unit 6. Bassow Decl., ¶¶ 13-15.  Not only will returning Mr. Bassow to Unit 4 place him at imminent risk of assault, but it also places him at risk of worsening his mental health symptoms due to his fears and anxieties about being in close proximity to the very patients with whom he has had conflicts and from whom he had to be separated in the first instance. *See id*.

Similarly, Plaintiff Class Member, Stephen Morgan, a man diagnosed with schizophrenia who is committed to the PSRB and resided on Unit 6 until his involuntary transfer on June 1, 2021 to Unit 4, has a history of conflicts with other patients on Unit 4. Morgan Decl., ¶ 12.  Only four months ago, Mr. Morgan was moved to Unit 6 from Unit 4 because one of the patients with whom he had a conflict threatened him. *Id*., ¶ 12. Now, because of the staffing shortages at WFH and decisions made by Defendants based upon administrative needs, rather than Mr. Morgan's clinical needs, he has been transferred back to Unit 4 where he again is housed with the patients with whom he has past conflicts, including the person who has threatened his safety. *Id*.  Mr. Morgan fears for his safety and understandably does not want to remain on Unit 4. *See id*., ¶ 11.

Additionally, some patients in general have histories of aggression, including physical aggression or harming others. Evaluations for these affected members of the Plaintiff Class are also needed before the Unit Merger can be implemented or any transfers made.  The failure to do so will result in immediate risk of irreparable harm to these individuals as these assessments are needed to ensure that they receive the individualized treatment in order to remain safe with others with whom they have had past and/or current conflicts and to restore or maintain their mental health.

Further compounding the problem and enhancing the serious risk of patient-to-patient assaults is the reduction in physical space that will be afforded the patients if the two units are merged.  As a result of the merger, there will be twice as many patients on one unit but only half the living space that they previously had when on separate units. *See* Bassow Decl., ¶ 15; Morgan Decl., ¶ 12.  Some of the patients will also be required to share dorm rooms with two or three other patients when previously, the Unit 6 patients each had their own rooms. *See* Bassow Decl., ¶ 9, Craigwell Decl., ¶ 12.  This sharing of bedroom space will also increase the likelihood

of patient-to-patient assaults—particularly without a prior specific assessment of risk.  The likelihood of assaults will also increase if patients like Mr. Bassow and Mr. Morgan are required to share rooms with other patients with whom they have a history of conflict. *See* Bassow Decl., ¶ 9.

Some of the patients who were transferred from Unit 6 to units other than Unit 4, are also at serious risk of physical harm.  For example, Plaintiff Class Member, Anthony Henry, a man with an intellectual disability, autism, and co-occurring mental health disabilities who is committed to the custody of the PSRB, was moved from Unit 6 to Unit 3, a competency restoration unit at WFH, because of staffing problems and census changes at the hospital. Werboff Decl., ¶¶ 4, 7.  Defendants unilaterally moved Mr. Henry without prior notification to Mr. Henry's conservator and without providing her the opportunity to have input regarding the move and discussion with Mr. Henry's treatment team. Werboff Decl., ¶ 10.   Because of Mr. Henry's intellectual disability and autism, Mr. Henry is particularly vulnerable to abuse and conflicts with other patients *See* Werboff Decl., ¶ 13.  Mr. Henry has resided on Unit 3 in the past and had conflict with other patients residing on that unit. *Id*.  It was these very conflicts which led, in part, to Mr. Henry's transfer to Unit 6 approximately two years ago. *Id*.  Now, he has been returned to Unit 3, without Defendants first having conducted a risk assessment or the necessary treatment planning in advance. Ms. Werboff does not believe Mr. Henry will be safe on Unit 3. *See id*., ¶ 14.

   b. *Loss of Opportunities for Active Treatment, Recreational and Leisure Activities and Risk of Regression*

Defendants' decision to transfer most of the patients from Unit 6 to Unit 4 and some to other units at WFH, including competency restoration units, even though the affected patients from Unit 6 and Unit 4 are almost all long-term patients who are committed to the custody of the

PSRB, places them at immediate risk of harm by impairing their ability to receive the active treatment that they have been assessed to need. For example, Mr. Henry was moved from Unit 6 to Unit 3, a competency restoration unit at WFH, because of staffing problems and census changes at the hospital. Werboff Decl., ¶¶4, 7. Because of Mr. Henry's intellectual disability and autism, he has specialized treatment needs that are different from other patients. *See id*., ¶¶ 5, 7, 8. Additionally, as a result of his disabilities, Mr. Henry experiences significant difficulty with transitions and any change requires careful advance planning. *See id*., ¶7. This requisite treatment planning did not occur before Mr. Henry was moved to Unit 3 from Unit 6. Instead, Defendants unilaterally moved Mr. Henry and only notified his conservator after the fact. *Id*., ¶¶ 4, 10. Mr. Henry and Ms. Werboff want for Mr. Henry to return to Unit 6.

The risk of harm to Mr. Henry as a result of his sudden administrative transfer from Unit 6 to Unit 3 is heightened by the fact that unlike of the staff on Unit 6 who were familiar with, and had some training, to work with people with autism like Mr. Henry, the staff on Unit 3 do not have this same background and training, nor are they familiar with Mr. Henry's unique treatment needs. *Id*., ¶ 8.

Additionally, when Mr. Henry was previously on Unit 3, he had problems including extreme lethargy and sleeping long hours during the day and night resulting from being over-medicated. Werboff Decl., ¶¶ 9, 14. After he was transferred to Unit 6, Mr. Henry made significant progress after his psychiatrist significantly reduced the amount of medication prescribed for him. Werboff Decl., ¶ 9. This reduction of medication improved Mr. Henry's problems with lethargy and ability to participate in active treatment. Now that Mr. Henry is back on Unit 3, there is a serious risk that because the treatment team there is not familiar with his treatment needs and that there was no planning for his transfer and transition, he will be

medicated more heavily and again become lethargic and sleep excessive hours which, in turn, will cause his health and habilitative skills to regress. *See* Werboff Decl., ¶¶ 9, 15.

In another example, Plaintiff Class Member, Mr. Connors— a patient with autism—was moved, against his wishes and without any discussion with him or his clinical treatment team, from Unit 4 to Unit 2 (*via* a short temporary stay on Unit 4A) in preparation for the merger due a history of being physically assaulted by three of the patients who reside on Unit 6.  Connors Decl., ¶¶ 4, 5, 7. However, Unit 2 is a competency restoration ward that serves patients who are deemed incompetent to stand trial.  The treatment for such individuals is substantially different than for individuals who are long-term PSRB patients such as Mr. Connors. *See id*., ¶ 7.   By moving him to Unit 2, Mr. Connors can no longer receive all of the individualized therapies that he needs so that he can make progress with his treatment and work toward his discharge as many of these treatment modalities are not available to him on Unit 2. *Id*., ¶¶ 7, 12.  Specifically, Mr. Connors cannot participate in the same group therapy in which he previously participated on Unit 6 as it is not available on Unit 2. *Id*., ¶ 12.  Likewise, he is unable to earn privileges to participate in activities as he could when he was on Unit 4 because they too are not available on his new treatment unit.  *Id*., ¶¶ 7, 12.  Mr. Connors would like to return to Unit 4 but would not feel safe if Defendants' plan to move the patients from Unit 6 is executed because he is afraid for his personal safety due to the past assaults by three patients from Unit 6. *Id*., ¶ 11.

## IV.    LEGAL ARGUMENT

*A.    The Standard for Granting a Temporary Restraining Order*

In the Second Circuit, the standard to prevail on a motion for a temporary restraining order (TRO) is the same as for a preliminary injunction.  *Natera Inc. v. Bio Reference Labs, Inc.*, No. 16 Civ. 9514, 2016 WL 7192106, at *2 (S.D.N.Y. Dec. 10, 2016)(collecting cases).  In order

to obtain temporary and/or preliminary relief, the movant must show that: (1) they are likely to succeed on the merits; (2) irreparable harm will result if the injunction is not granted; (3) the balance of equities weighs in favor of the plaintiff and (4) that the granting of the preliminary injunction is in the public interest. *Basank v. Decker*, 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020)(TRO granted where detainees demonstrated imminent risk of irreparable harm as a result of their continued detention during the COVID-19 pandemic.). The movant "must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages. *NAACP of Town of E. Haven*, 70 F.3d 219, 224 (2nd Cir. 1995). The decision whether or not to issue a preliminary injunction lies within the broad discretion of the trial court. *Almontaser v. N.Y.C. Dep't of Educ*., 519 F.3d 505, 508 (2d Cir. 2008)(per curiam)(internal quotations and citations omitted).  The most important consideration when determining whether a TRO or preliminary injunction should be granted is whether the movant will suffer irreparable harm. *Basank*, 494 F. Supp. 3d at 209 citing *Faiveley Transport Malmo AB v. Wabtec Corp*, 559 F.3d. 110, 118 (2d Cir. 2009)(internal quotation marks and citations omitted).

Here, a temporary prohibitory restraining order is necessary to prevent further irreparable harm to the Plaintiffs caused by the Defendants' failure to provide Plaintiffs with individualized assessments and individualized active treatment after a treatment team meeting, including the Plaintiffs and their legal representatives prior to moving them the merged treatment unit or to other units to ensure that their treatment and safety needs are adequately met.  As more fully set forth in Sections IV.B-F, *infra,* the Plaintiffs have met all of the factors necessary for this Court to issue the requested temporary restraining order.

*B. There is a Substantial Threat That the Plaintiffs Will Suffer Irreparable Injury if a Temporary Restraining Order is Not Granted.*

Defendants' decision to move the patients from Unit 6 to Unit 4 and other units is based on administrative need and not the individual treatment needs of the patients. *See* Section III.B.1, *supra*. In implementing their unit merger plan, Defendants fell into noncompliance with the relevant provisions of the *Roe* Order and, in turn, placed the affected Plaintiff Class Members at imminent risk of irreparable harm. The *Roe* Order requires that the Plaintiffs receive individualized assessments and mental health treatment so that they have the opportunity to "be provided with appropriate care and treatment which has its goal the restoration of the patient to, or maintenance of the patient at his/her highest level of functioning, . . ." Order at ¶ 13. This includes, but is not limited to, adequate assessments, treatment planning, and treatment to ensure protection from harm and the opportunity to restore and/or maintain a patient's mental health. Likewise, the United States Constitution similarly mandates such treatment. [4]*Youngberg v. Romeo,* 457 U.S. 307, 315 (1982)(individuals committed for involuntary mental health care have a right to minimally adequate protection from harm and treatment under the Fourteenth Amendment to the U.S. Constitution), *see also, Woe v. Cuomo*, 638 F. Supp. 1506, 1516 (E.D.N.Y. 1986)("[t]he involuntarily committed patient has a right to decent and humane conditions") reversed on other grounds, 801 F.2d 627 (2d Cir. 1986); *see also P.C. v. McLaughlin*, 913 F.2d 1033, 1044 (2d Cir. 1990) quoting *Doe v. New York City Department of Social Services*, 649 F.2d 134, 141 (2d Cir. 1981)("[t]he law makes clear that '[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the non-feasance of which may violate

---

[4] Here, the issue with respect to the adequacy of the treatment pertains to whether Defendants complied with the *Roe* Order.

the constitution'"); *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1245, 1247 (2d Cir. 1984).

The failure to provide PSRB patients at WFH, such as the affected members of the Plaintiff Class, with the necessary assessments, treatment planning, active treatment and necessary protection from harm as required by the Consent Decree and by law constitutes irreparable harm. *See Jolly v. Coughlin,* 76 F.3d. 468, 482 (2d Cir. 1996)("It is the alleged violation of a constitutional right that triggers a finding of irreparable harm."); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)("When an alleged deprivation of constitutional rights is involved, most courts hold that no further showing of irreparable injury is necessary.").

Here, some of the affected Plaintiffs have been placed at imminent risk of irreparable harm because they are no longer able to receive all of the necessary active treatment, activities and opportunities for recreation and leisure that they require, as set forth in their treatment plans. For example, some, like Plaintiffs Connors and Henry, were transferred from Units 4 or 6 and now are on a competency restoration unit that has entirely different treatment available than a long-term unit for individuals who are committed to the custody of the PSRB. *See* Connors Decl., ¶¶ 7, 12; Werboff Decl., ¶¶ 7-14.  As such, they are not able to obtain all of the specific treatment that they need to restore their mental health because the treatment that they need, and which has been prescribed by their Unit 6 treatment teams, is not available on the competency restoration units. *See id*.

Some are at risk of irreparable harm—specifically physical assaults and altercations— with other patients with whom they have had past and/or ongoing conflicts.  As explained above in Section III.B, under Defendants' merger plan, some of the affected Plaintiffs will be housed with the very individuals from whom their treatment teams decided to separate them. *See e.g*.,

Morgan Decl., ¶12; Bassow Decl., ¶¶ 9, 14, 15. This is exacerbated by the reduced space and requirement that some of the Plaintiffs will be required to sleep in a dormitory style room with the two to three other patients. *See* Section III.B.1.a, *supra*.

In determining whether to grant temporary and preliminary injunctive relief the Court should also consider whether the movants have an adequate remedy at law. *See NAACP*, 70 F.3d at 224. The absence of the existence of such a remedy weighs in favor of a TRO and/or a preliminary injunction. Here, Plaintiffs have no adequate remedy at law.

C. *There is a substantial likelihood that the Plaintiffs Will Prevail on Their Claims.*

    1. <u>Defendants' Failure to Ensure Sufficient Staffing at WFH and Instead Forcing Patients to Change Treatment Units Violates the Roe Consent Decree</u>

Plaintiffs are likely to prevail on their Motion for Compliance because, as explained below, Defendants' sudden and administrative decision to transfer most of the patients from Unit 6 to Unit 4 and some to other units, violated the provisions of the *Roe* Order that explicitly require that all of the decisions regarding the Plaintiff Class' treatment be made based on clinical assessments and through a comprehensive treatment planning process that includes full participation by the patient and/or his legal representative. *See* Order, Appendix 1.

Courts construe a consent decree as they would a contract. *U.S. ex rel Anti-Discrimination Center of Metro N.Y., Inc. v. Westchester Co., N.Y*, 712 F.3d. 761, 767 (2d Cir. 2013) *quoting Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007)("Consent decrees 'reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable."). Specifically, Courts first look to the terms of a consent decree in order to determine the obligations and rights of the parties. *Id*. at 768. However, in interpreting consent decrees, courts do not look at any one provision in isolation but rather "in light of the obligation as a whole and the intention of the parties as manifested thereby." *Id*. at

767 *quoting JA Apparel Corp. v Abboud*, 568 F.3d 390, 397 (2d Cir. 2009)(citations and internal quotation marks omitted).

Here, when construing the provisions of the *Roe* Order, it is clear that Defendants, as a result of implementing their merger plan to address their understaffing problems, are in noncompliance with several provisions of the Decree.  Thus, Plaintiffs are likely to prevail on their claims that Defendants are in noncompliance with several portions of the *Roe* Order.

1.   Defendants are in noncompliance with Paragraphs 11 and 13 of the Order.

First, Defendants' merger plan violates Paragraphs 11 and 13 of the Order.  Paragraph 11 requires that ["a]ll decisions concerning the care and treatment of PSRB patients *shall* be made on the basis of individual evaluations and assessments." Order, Section II, ¶11 (*emphasis added*). Likewise, Defendants are also in noncompliance with Paragraphs 13 and 15.b of the Order. Paragraph 13 requires that:

> The DMH hospitals are also responsible for insuring [sic] that decisions concerning the care and treatment of PSRB patients are made *after explicit*, *individualized* consideration of their history, the course of their disability, their current mental status, and a determination of whether participation in any particular program or activity will pose a danger to the patient or others. PSRB patients shall be provided with appropriate care and treatment which has its goal the restoration of the patient to, or maintenance of the patient at his/her highest level of functioning, . . . In this regard all treatment decisions concerning PSRB patients shall be made only *after* an individualized evaluation and assessment of each patient which explicitly considers and documents the patient's mental status and degree of danger, if any.

Order, ¶ 13 (*emphasis added*).  The plain language of the Order mandates that such assessments "shall" be completed and that any treatment decisions with respect to a patient's treatment must be made "after" the evaluations are completed.

Here, Defendants abruptly announced their unit merger plans to Plaintiffs on May 17, 2021.  This decision was made without the requisite sufficient individual evaluations or assessments to determine the appropriateness of the transfer of the individual patients or how

18

their individual treatment needs would be affected.  Consequently, as discussed above in Sections III and IV.B, above, absent a TRO, plaintiffs will continue to be at risk of imminent harm.  Specifically, due to Defendants' failure to afford the Plaintiffs with explicit and required individualized assessments and related treatment planning with respect to the transfers, some are being forced to reside on treatment units with patients with whom they have had prior conflicts and for whom past clinical determinations have been made to separate them.  *See e.g*, Morgan Decl., ¶ 12; Bassow Decl., ¶¶ 13-14.  Notably, prior to deciding to implement their unit merger plan, some of the affected Plaintiff Class Members' treating professionals assessed them to need protection and separation from others with whom they had prior conflict. *See* Section III.B., *supra*.  Now, due to administratively driven needs, Defendants are proceeding to undo those critically important clinical decisions.  Barreling forward without adequately addressing those clinical determinations will necessarily pose an increased risk of danger and harm to these patients.  Conversely, had Defendants done the necessary assessments and treatment planning and obtained the requisite input from the affected patients and/or their legal representatives, they would not have reasonably proceeded with the unit merger plan that poses such potential for immediate and irreparable harm.

Some are also at imminent risk of not receiving the necessary care and treatment that they need in order to have their mental health restored, or maintained, at the highest level of functioning, due to the Defendants' administrative decision to transfer them, without individual assessments and treatment planning, to other units that do not have available all of treatment that they need. *See e.g*, Connors Decl., ¶¶ 7-12; Werboff Decl., ¶¶ 7-14.

2. <u>Defendants are also in noncompliance with Paragraphs 15.b.ii and 17 of the Order due to their failure to permit the Plaintiffs with the opportunity to fully participate in their treatment planning prior moving them to Unit 4 or other Units.</u>

Defendants actions also violated Paragraph 15(b)(ii) of the Order that provides that "[e]ach patient shall be allowed and encouraged to fully participate in person in the development of his/her treatment plan. . . . opportunity to fully participate in the treatment planning process, and the right to express written approval or disapproval of the treatment plan. . . ." *Id*., II.15(b)(ii).  Additionally, under this provision of the Order, any "substantial modifications to the treatment plan will not be made…without the participation of the patient except in emergency circumstances where the condition of the patient is of an extremely critical nature as that term is referenced in C.G.S. § 17-206(d)(c)." (now codified at C.G.S. § 17a-543). Likewise, Defendants are in noncompliance with Paragraph 17 of the Order that prohibits Defendants from unilaterally changing any patient's master treatment plan. Order, ¶ 17.

When Defendants decided to close Unit 6 and merge most of the patients together on Unit 4 to attempt to address staffing shortages, this decision was made without providing any of the affected patients with the opportunity to participate in this aspect of their treatment planning or to disapprove of the treatment plan as is their explicit right under Paragraph 15(b)(ii) of the Order.  *See* Decls. of Connors, ¶ 4, 7, 8,13; Werboff, ¶¶ 4, 7, 10, 15; Bassow, ¶ 6, 9, 10, 12, 16; Morgan, ¶ 5, 7, 8; Craigwell, ¶ 6, 10, 11, 12.

Defendants also violated Paragraph 15(b)(ii) of the Order by making changes to Plaintiffs' treatment without participation of the patient.  Defendants were not excused from doing this as there was no "emergency" as defined in the Order to warrant such a failure to include the patients and their legal representatives in individualized treatment planning prior to the transfer.  Had Defendants included the affected Plaintiff Class Members in the requisite

treatment planning before imposing their unit merger plan and sought such input from them, as required by the *Roe* Order, they would have heard from the Plaintiffs and/or their legal representatives, that the proposed move imposed real and immediate risk of harm or injury – that's precisely why the *Roe* Order obligates Defendants to follow that process. These are not merely technical requirements that Defendants failed to follow, but instead requirements tied to clinical needs of the Plaintiff Class that Defendants are obligated to address.

Additionally, paragraph 15.b.ii states that each patient has a right to an advocate. Order, ¶ 15.b.ii. Despite this requirement, none of the patients were provided the opportunity to meet with their advocate until after being told the move was going to occur or to object.

3. Defendants Failed to Base Their Decision to Close Unit 6 and Transfer the Unit 6 Other Patients for Reasons that Were Not Clinically Based.

Under Paragraph 13 of the Order, Defendants are required to provide PSRB patients with appropriate care and treatment that has as its goal the restoration or maintenance of the patient at his or her highest level of functioning. Order at ¶ 13. Humane, dignified and clinically appropriate treatment means including the patient in decisions about their treatment, including which unit they reside on. Treatment should be individualized and clinically appropriate.

The decision to close Unit 6 and transfer the patients was not based on the needs of the patients but on administrative convenience and fiat. The transfers were/are being done for collective administrative convenience, not for a clinical reason, not based on the requisite individualized assessments of the patient's clinical need and not in order to maintain any patient at their highest level of functioning. The transfers will likely disrupt each patient's life, routines, comfort, safety, treatment and privileges and overall ability to have their mental health restored and/or maintained.

4.   Defendants' actions also violate Paragraph 15.b.iv of the Order

Paragraph 15.b.iv. of the Order provides that each patient's master treatment plan shall include a description of the particular services and programs which are adequate and appropriate, and the location and frequency thereof, consistent with the patient's needs and least restrictive of their freedom.  Defendants informed the patients on WFH U6 that the unit was closing and they would be transferred.  All of the patients' master treatment plans were written by WFH Unit 6 staff and for treatment and programs for Unit 6.  The location and frequency was for WFH U6. None of the affected Plaintiff Class Members' master treatment plans, other than possibly Mr. Henry, since he has already been moved, provides for any services or location of treatment other than on WFH U6.

D.   *The Plaintiffs' Substantial Injuries Outweigh any Injury Outweigh any Injury the Defendants Might Suffer if a Temporary Restraining Order Issues.*

The substantial injuries to the Plaintiff Class sharply outweigh any injury to Defendants. Defendants' plan to merge Units 4 and 6, and transfer patients elsewhere at WFH, without the necessary individualized assessments of risk and place them together on a unit with the very patients from who they had to be separated due to safety concerns places them at risk of irreparable harm.  For example, Unit-6 patients Plaintiffs Hal Bassow and Stephen Morgan each have histories of physical altercations with some of the patients who are on Unit 4 and were transferred to Unit 6, in part to separate them from these patients for their safety. They will now, under Defendants' unit merger plan, be housed with the very people who have threatened their physical safety. Bassow Decl., ¶¶14, 15.; Morgan Decl., ¶ 12.  They are also at risk of exacerbated mental health symptoms resulting from the stress and trauma of being forced to live in close proximity with the people with whom they have ongoing conflicts. Bassow Decl., ¶¶14, 15; Morgan Decl., ¶ 12.

Additionally, Defendants' failure to provide Class Members with the necessary evaluations and professional assessments and evaluations and treatment planning, prior to implementing their unit merger plan, places them imminent risk of irreparable harm as a result of lost opportunities to restore their mental health, become more engaged in useful activities, and be more independent.   For example, some like Plaintiff Thomas Connors are at risk of imminent harm due to lost opportunities to participate in treatment and activities in order to allow him to have his mental health restored, or maintained, at the highest level of functioning. *See e.g*., Connors' Decl., ¶ 7.  Others, such as Plaintiff Anthony Henry, are at risk of deterioration and losing skills as a result of the transfer. *See e.g.,* Werboff Decl., ¶¶ 9, 14. Defendants, by contrast, will suffer little or no harm, particularly because a temporary restraining order simply requires Defendants to do what they are already legally required to do, but with the specificity and oversight to ensure that they adhere to their legal obligations.

Furthermore, any claim that Defendants may make with regard to hardship due to fiscal constraints cannot serve as a valid excuse for not fulfilling their obligations under a consent decree.  Here, Defendants have a clear obligation, to which they consented, to fulfil the requirements of the *Roe* Order.  Further, when a governmental entity involuntarily commits a person for mental health treatment, it has an obligation to provide such treatment and protection from harm. *Youngberg v. Romeo*, 457 U.S. at 324.

Moreover, nothing in the *Roe v. Hogan* Consent Decree excuses Defendants from compliance because of resource constraints or administrative problems such as understaffing or census changes. To the contrary, the language in the Consent Decree with respect to Defendants' obligations is mandatory. *See e.g*., Order, ¶ 11 ("all decisions concerning PSRB patients shall be made on the basis of individual evaluations and assessments); ¶ 13 (Defendants are "responsible

for insuring [sic] that decisions concerning the care and treatment of PSRB patients are made after explicit, individualized consideration of their history, the course of their disability, their current mental status, and after a determination of whether participation in any particular program or activity will pose a danger to the patient or others); and ¶ 15.b.ii ("[e]ach patient shall be allowed and encouraged to fully participate in person in the development of his/her treatment plan . . . each shall have the opportunity to fully participate in the treatment planning process, and the right to express written approval or disapproval of the treatment plan . . ."). When the Class Members' loss of individualized assessments, treatment planning, treatment, and protection from harm are balanced against the modest, if any, fiscal cost to Defendants, the balance of harm clearly tilts in favor of a temporary restraining order.

> E.      *An Injunction Will Serve the Public Interest*

Courts have consistently held that the public interest is served where injunctions are issued to stop government officials and entities from violations of the law, particularly with respect to constitutional and statutory laws pertaining to civil rights. *See Basank*, 449 F. Supp. 3d at 216. Likewise, courts have also routinely found TRO and preliminary injunctions to be in the public interest where such orders sought to protect individuals, including patients involuntarily committed for inpatient mental health treatment, rights to safety and treatment. *See Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005).

Here, the TRO, if issued, will serve the public interest because the rights at stake are constitutional rights to treatment for individuals with mental illness involuntarily committed for mental health treatment at the State of Connecticut's Whiting Forensic Hospital. And, as discussed above in Sections IV.B and C, respectively, plaintiffs have demonstrated both that they are a risk of suffering irreparable harm and are likely to succeed on the merits of their Motion for

Compliance.

     F.     *The Plaintiffs Should Not Be Required to Post a Security Bond as a Condition of the Temporary Restraining*

The Plaintiffs should not be required to post a security bond if a preliminary injunction is issued.  Although Fed. R. Civ. P 65 (c) permits courts to order the posting of a bond, they are not required to do so.  *Govt. Employees Insurance Co. v. Wellmart Rx, Inc*., 435 F. Supp. 3d 443, 455-56 (E.D.N.Y. 2020) appeal dismissed Second Cir. 20-225 (May 11, 2020) *quoting Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dept. of Soc. Svs*., 50 F.3d 1168, 1174 (2nd Cir. 1995). Further, courts regularly waive the bond requirement where a case "raises issues that seek relief involving the 'public interest' arising out of 'comprehensive federal health and welfare statutes." *Govt. Employees*, 435 F.Supp.3d at 456.  Courts also regularly decline to require a plaintiff to post bond where the harm to the plaintiff significantly outweighs the harm to defendant and the plaintiff is indigent. *Temple Univ. v. White*, 941 F.2d 201, 220 (3rd Cir. 1991) (waiver of bond requirement in case brought to enforce Medicaid Rights); *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 385 (C.D. Cal. 1982) (Court declined to order indigent El Salvadorian plaintiffs to post security when a TRO was issued against defendants.).

Here, Plaintiffs' claims arise out of allegations that Defendants are not complying with the *Roe* Consent Decree that was specifically meant to address Connecticut's obligation to provide mental health care and protection from harm to people with mental health disabilities who are involuntarily confined to WFH.  The Plaintiffs are also indigent.  Because of their involuntary confinement to WFH, they have little to no opportunities to earn any money.  Moreover, as discussed above in Section IV.E, any harm to the Defendants resulting from the issuance of a temporary restraining order is sharply outweighed by the harm to the Plaintiffs if such an injunction does not issue.  For the above-discussed reasons, the Court should exercise its broad

discretion and decline to require Plaintiffs to post a security bond if a TRO issues.

## V.   CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' accompanying Motion

for TRO, Plaintiffs' Motion for a TRO should be granted.


Dated: June 3, 2021                          s/ Kirk Lowry
                                         Kirk Lowry (ct27850)
                                         Kathleen Flaherty (ct19344)
                                         Connecticut Legal Rights Project, Inc.
                                         P.O. Box 351, Silver Street
                                         Middletown, CT 06457
                                         Phone: (860) 262-5017
                                         Fax: (860) 262-5035
                                         Email: klowry@clrp.org
                                                 kflaherty@clrp.org


                                         /s Stephen Byers
                                         Stephen Byers (ct30840)
                                         Deborah A. Dorfman (application to appear *pro
                                         hac vice* pending)
                                         Disability Rights Connecticut (DRCT)
                                         846 Wethersfield Avenue
                                         Hartford, CT 06114
                                         Phone: (860) 297-4300
                                         Fax: (860) 296-0055
                                         Email: stephen.byers@disrightsct.org
                                                 deborah.dorfman@disrightsct.org

                                         *Counsel for Plaintiff Roe and the Plaintiff Class*

Certificate of Mailing

I hereby certify that the above Plaintiffs' Memorandum in Support of Plaintiffs' Motion for TRO was filed on the Court's CM-ECF filing system and emailed to all counsel on the 3rd day of June 2021 to:

Emily Melendez
Assistant Attorney General
Health Care Unit
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Emily.Melendez@ct.gov

Deborah L. Moore, Esq.
Agency Legal Director
Dept. of Mental Health and Addiction Services
410 Capitol Avenue, 4th Floor
Hartford, CT 06134
Deborah.Moore@ct.gov

And,

David J. McGuire
Dan Barrett
ACLU-CT
765 Asylum Avenue
Hartford, CT 0610
DBarrett@acluct.org
Monitor and Class Counsel

s/Kirk W. Lowry
Kirk W. Lowry