UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM ROE *et al*, <br> *on behalf of themselves and all others* <br> *similarly situated*, <br>     *Plaintiffs*, <br><br> v. <br><br> MICHAEL HOGAN *et al*, <br>     *Defendants*. | )   2:89-CV-00570 (KAD) <br> ) <br> ) <br> ) <br> ) <br> )   June 18, 2025 <br> ) <br> ) |

**MEMORANDUM OF DECISION**
**RE: Motion for Compliance (ECF NO. 239)**

Kari A. Dooley, United States District Judge:

On December 18, 2024, Christopher Reh ("Reh" or "Movant"), who is proceeding *pro se*,[1] filed a Motion for Compliance pursuant to the consent decree in this case. ECF No. 239. He also filed an accompanying Motion for Independent Psychiatric Evaluation pursuant to Federal Rule of Evidence 706. ECF No. 252. Defendants oppose both motions.[2] ECF Nos. 244, 245, 253. Because Reh misapprehends the remedies available to him under the consent decree, as well as the scope and nature of the consent decree's requirements, both Reh's Motion for Compliance and Motion for Independent Psychiatric Evaluation are DENIED.

---

[1] Reh's motion was prepared with the assistance of his attorney who is representing him before the PSRB. Mot. for Compliance, ECF No. 239, at 1 n.1.

[2] Defendants filed both a public redacted (ECF No. 244) and sealed (ECF No. 245) version of their opposition to the motion for compliance because it contained private medical information. *See* Local Civ. R. 5(e)(3). The Court granted their accompanying motion to seal. ECF No. 248. Where the Court refers to Defendants' memorandum or supporting materials, it will cite to the public redacted versions, if possible.

**The Consent Decree**

On August 31, 1989,[3] patients committed to the jurisdiction of the Connecticut Psychiatric Security Review Board ("PSRB")[4] filed this class action lawsuit against various Commissioners of the Department of Mental Health and Addiction Services. "The class alleged violations of: (1) their right to appropriate medical and psychiatric treatment, (2) right to be free from unnecessary restraint, (3) their right not to be deprived of their liberty without due process of law, and (4) their right not to be discriminated against because of their mental handicap as guaranteed by the First and Fourteenth Amendments of the United States Constitution." *Roe v. Hogan*, No. 2:89-CV-570 (PCD), 2005 WL 8167655, at *1 (D. Conn. Sept. 30, 2005).

In December 1990, the parties settled the claims through the entry of a consent decree (the "Decree"), which remains in full force and effect today. The stated purpose of the Decree is to ensure that PSRB patients are not "denied access to appropriate therapeutic, recreational, rehabilitative or leisure activities which are available to other patients solely because of the patient's commitment to the PSRB." Consent Judgment, ECF No. 180-2 (the "Decree"), ¶ 11. It recognizes that "[a]ppropriate psychiatric treatment requires that patients be given increasing levels of freedom and responsibility consistent with their individual clinical status." *Id.* ¶ 12. It further requires that decisions concerning the care and treatment of PSRB patients be made "only after an individualized evaluation and assessment of each patient which explicitly considers and documents the patient's mental status and degree of danger, if any." *Id.* ¶ 13. To that end, the Decree sets forth several policies and procedures designed to ensure that PSRB patients are treated

---

[3] This matter was originally pending before the Honorable Peter C. Dorsey. It was transferred to the undersigned for all further proceedings on June 13, 2019. ECF No. 167.

[4] Connecticut law provides that individuals who are acquitted by reason of mental disease or defect pursuant to Conn. Gen. Stat. § 53a-13 may be committed to the PSRB's jurisdiction for treatment and confinement. *See* Conn. Gen. Stat. §§ 17a-580 *et seq.*

on an individualized basis and in a manner that is least restrictive on their freedom. *See generally id.* ¶¶ 15, 17–21. The Decree does not address substantive psychiatric treatment for PSRB patients. Instead, it provides procedural safeguards to protect PSRB patients from arbitrary decision-making and to ensure that PSRB patients are being treated on an individualized basis. *See id.*

The Decree also contains an enforcement provision, which permits plaintiffs to initiate proceedings in this Court to seek compliance with the Decree's terms. *Id.* ¶ 29.

**Factual Background and Procedural History[5]**

Christopher Reh is currently committed to the jurisdiction of the PSRB and resides at Dutcher Enhanced Security Service ("Dutcher") at Whiting Forensic Hospital ("Whiting"). Decl. of Christopher Reh ("Reh Decl."), ECF No. 239, ¶ 2. Reh spent approximately five years at Whiting Maximum Security, before he was transferred to Dutcher, a lower security building, in January 2022. *Id.* ¶ 3; *see also* Reh Decl., Ex. A, ECF No. 239 ("Sept. 2024 Letter"), at 1.

By way of brief background, PSRB patients are allowed various levels of freedom of movement and access to the hospital and wider community through a "privilege level (PL) system." Public Defs.' Opp'n, Ex. A, ECF No. 244 ("Public Gilbo Aff."), ¶ 11. A PSRB patient's treatment team sets his or her privilege level. A Level 1 pass is the most restrictive PL, while a Level 4 pass is the least restrictive and permits unsupervised trips on hospital grounds and in the community. *Id.* ¶ 12. The treatment team may also choose to designate a "[l]imited" PL for patients who "are working toward but have not reached the next higher PL," where certain PL restrictions may remain in place, but others may be loosened on an individualized basis. *Id.* ¶ 13.

---

[5] The Court, in setting forth the clinical background regarding Reh's treatment, is not assessing the propriety of the treatment decisions or making any findings regarding the propriety of those decisions. As discussed, the Decree does not contemplate judicial review of such decisions. The Court offers this background because the Decree does require that PSRB patients receive an appropriate and individualized process in connection with treatment decisions.

Between September 2023 and February 2024, Reh's PL was a full Level 4, meaning that he "had access to all available pass times as part of his PL." Sealed Defs.' Opp'n, Ex. A, ECF No. 245 ("Sealed Gilbo Aff."), ¶ 15.[6] In February 2024, Reh's treatment team lowered his PL to Level 3A (restricted to Whiting grounds only, Public Gilbo Aff. ¶ 12), after he left a voicemail message with his former therapist after he had been asked not to contact her. Sealed Gilbo Aff. ¶ 16. His treatment team characterized this voicemail as having an "escalating and threatening quality" that "further illustrated his inability to sustain healthy boundaries with others." *Id.* Reh acknowledges that he contacted his former therapist, but he contends that it was for the purpose of notifying her of a pending legal action. Reh Decl. ¶ 21. At the time, his treatment team explained their concerns to Reh and why they lowered his PL. Sealed Gilbo Aff. ¶ 16. A month later, Reh reportedly expressed "ambivalence" about increasing his PL back to his prior Level 4 status—specifically, he submitted a request to increase his PL, but later withdrew it. *Id.* ¶ 17.

In April 2024, after Reh showed improvement, his PL was increased back to Level 3B (which allowed him to participate in staff-supervised trips off Whiting grounds). *Id.* ¶ 18. But soon after, in July 2024, the treatment team returned his PL to Level 3A, after he began exhibiting "increased impulsive behavior and sleep disruption," which Reh himself had previously identified as early warning signs of more serious mental health symptoms. *Id.* ¶ 19. Reh also began to "decline participation in individual therapy" around this time. *Id.* ¶ 18. Of note, Reh initially agreed with this PL change, as it allowed the treatment team to more closely monitor him to try to address both new and reemerging symptoms. *Id.* ¶ 19; Public Gilbo Aff. ¶ 19. In September 2024, Reh was transferred to Unit South 1 in Dutcher (a more restrictive unit) and was assigned a new

---

[6] Throughout this opinion, the Court cites to information from the Defendants' sealed affidavit, but only to the extent necessary to explain its decision. *See supra* at n.2. In so doing, the Court has considered Plaintiff's privacy concerns, as well as the presumption of public access to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006).

4

treatment team. Sealed Gilbo Aff. ¶ 22. His new and old treatment teams engaged in multiple meetings, analyses, and discussions about next steps, and they determined that the best way forward was for Reh to participate in a "behavioral chain analysis," which would "allow for Mr. Reh to have more input into his treatment goals" and to allow him to be fully transparent and increase his understanding of his behavior. *Id.* However, Reh repeatedly declined to participate in this analysis. *Id.* ¶ 23.

On September 23, 2024, Reh sent a letter requesting a review of his PL as contemplated under the Decree to Dr. Nadia Gilbo, a psychiatrist and Chief Medical Officer of Whiting. Public Gilbo Aff. ¶ 3; Sept. 2024 Letter at 1–2. In that letter, Reh requested that over the next 60 days, his "full level 4 privileges be restored incrementally based on [his] clinical status and not on arbitrary requirements such as group attendance or 'level of engagement.'" Sept. 2024 Letter at 2.

In response to Reh's request for review, and also as contemplated under the Decree, Dr. Gilbo led a review meeting of Reh's clinical status on October 30, 2024. Public Gilbo Aff. ¶ 4. Present at the meeting were Reh himself, his attorneys, Whiting's and Dutcher's medical directors and program directors, the unit psychologist, attending psychiatrists and psychologists, attending social workers, and members of Reh's family and friends. Reh Decl., Ex. B, ECF No. 239 ("Nov. 2024 Report"), at 2–3. On November 24, 2024, the review panel issued a report summarizing their review and finding that Reh's Level 4 privileges could not be restored at that time because the psychiatric team could not adequately assess his psychiatric status, as a result of Reh's "reluctance to fully participate in his treatment." *Id.* at 5.

5

On December 4, 2024, Reh's attorney sent a notice to Dr. Gilbo pursuant to Paragraph 29[7] of the Decree, informing them that, in their view, Whiting was not in compliance with the Decree as it relates to Reh's treatment. Reh Decl., Ex. C, ECF No. 239 ("Dec. 2024 Notice"). The notice alleged that Whiting "failed to provide Mr. Reh with psychiatric treatment that is clinically appropriate," that it refused to "collaborate with Mr. Reh about a reasonable plan to return to the community," and that Whiting had instituted punitive measures after Reh advocated for himself, including by "placing [him] in a more acute unit at the hospital, taking away his opportunities for individual therapy, and severely restricting his privileges." *Id.* at 2–3.

After Whiting did not remedy these alleged injuries, Reh, proceeding *pro se*, filed the present motion for compliance on December 18, 2024. ECF No. 239. Defendants filed their memorandum in opposition and accompanying exhibits on February 10, 2025. ECF No. 244, 245; *see supra* at n.2. Reh filed his reply on February 20, 2025. ECF No. 247. Reh then filed several accompanying motions, to include a motion for independent psychiatric evaluation pursuant to Federal Rule of Evidence 706(a), ECF No. 252.

**Standard of Review**

A consent decree establishes legally binding responsibilities among parties. "Consent decrees are a hybrid in the sense that they are at once both contracts and orders; they are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.2d 1556, 1567–68 (2d Cir. 1985) (citation omitted). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of

---

[7] Paragraph 29 provides, in relevant part: "In the event plaintiffs believe that defendants are in non-compliance with this Agreement, plaintiffs will inform the defendants in writing and afford them ten days to remedy the problem." Decree ¶ 29.

6

litigation.  Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. . . .  For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.  Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971).

Nevertheless, "[s]ince a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract.  Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree.  Such reliance does not in any way depart from the 'four corners' rule of *Armour*."  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) (footnote omitted).

**Discussion**

Reh contends that Whiting is violating the Decree by changing his PL without clinical justification and by keeping him in a more restrictive facility than is necessary.  Mot. for Compliance at 1.  Specifically, Reh argues that Whiting stripped him of his full Level 4 status in February 2024 for punitive reasons and that they have continued to punish him by not taking "appropriate steps to transition him to a less restrictive environment." *Id.* at 6 ¶ 4(BB).  Defendants respond that they have followed the procedural requirements laid out in the Decree and that Reh's

subjective view of his own clinical status is insufficient to show that his PL was improperly adjusted. Defs.' Opp'n, ECF No. 244, at 1. The Court agrees with Defendants.

As discussed above, the Decree does not address substantive psychiatric treatment for PSRB patients. It does not require or preclude any particular substantive determination as it might relate to a PSRB patient. Rather, in order to address the allegedly disparate treatment of PSRB patients based solely on their status as PSRB patients, it provides procedural safeguards to protect PSRB patients from arbitrary decision-making and to ensure that PSRB patients are being treated on an individualized basis. Decree ¶¶ 15, 17–21. Reh does not seek to enforce compliance with these procedural safeguards. He asks this Court to assess the clinical decisions of his treatment team and to enforce a different treatment plan—one to his liking. On this largely undisputed procedural record, it is clear that he received an individualized assessment at every step of the clinical process. Accordingly, there is no basis upon which to conclude that Whiting's decision to decrease Reh's PL in February 2024 or Reh's transfer to Unit South 1 in Dutcher were arbitrary, unprompted, or punitive.[8]

It is equally clear that Reh's transfer to Unit South 1 in Dutcher occurred after his treatment team conducted the individualized assessment required under the Decree. Reh emphasizes that Unit South 1 is a "more acute and restrictive unit," Reh Decl. ¶ 27, which may be true, but that transfer decision was not made in isolation or on a whim. By September 2024, the clinical team had observed increasingly concerning behaviors from Reh over a period of several months, including behaviors that he himself previously had identified as "early warning signs" of a more

---

[8] Although not subject to this Court's review under the Decree, Dr. Gilbo's affidavit explains the clinical and safety reasons why Whiting lowered Reh's PL in February 2024—the voicemail to his former therapist, after he had been asked not to contact her—and Reh concedes that he did, in fact, contact her. Sealed Gilbo Aff. ¶ 16; Reh Decl. ¶ 21. The clinical team was not only concerned about Reh's behavior, but also the possibility that with a Level 4 PL, he could run into his former therapist while in his own custody. Sealed Gilbo Aff. ¶ 16.

serious mental health crisis. *See* Sealed Gilbo Aff. ¶ 19. Based on these observations, the clinicians, as required under the Decree, assessed the propriety of a more restrictive housing unit. It is worth further observation that one of the other reasons provided by Whiting for transferring Reh to a new unit was to change his treatment team and provide the opportunity to develop a new and fresh therapeutic relationship, *id.* ¶ 22, which aligned with Reh's own goals and frustrations with his prior clinical team, *see* Reh Decl. ¶ 15 (indicating that Reh "withdrew from treatment out of frustration with [his] clinical team"); *see also* Nov. 2024 Report at 3 (describing Reh's dissatisfaction with his prior treatment team). Based on the record, this transfer was certainly not arbitrary and indeed occurred as part of the individualized treatment plan developed for Reh.

Nor is there any basis upon which to conclude that the review process undertaken between September and December 2024 suffered from any procedural irregularities or unreasonableness. The review meeting contemplated under the Decree was comprehensive and was attended by Reh himself, his attorneys, and his family and friends, as well as Whiting staff. *See* Nov. 2024 Report. From the report summary, it's clear that Reh and his representatives had the opportunity to speak and participate in the review, and indeed, Dr. Gilbo and others engaged in an extensive dialogue with Reh about his problems with his prior treatment and how they could correct them. *See id.* at 4. There is no evidence that Reh or his representatives were denied participation in this review process. *See* Decree ¶ 15(b)(ii) ("Each patient shall be allowed and encouraged to fully participate in person in the development of his/her treatment plan."). Reh simply does not agree with the treatment plan that was settled upon by his clinicians.

Lastly, Reh argues that Whiting has improperly refused to increase his PL based on "arbitrary requirements such as group attendance or 'level of engagement,'" instead of based on his individualized clinical status, as the Decree requires. Sept. 2024 Letter at 2. This appears to

9

refer both to Reh's refusal to participate in both individual therapy and the behavior chain analysis. This argument fails. As Defendants explained in the November 2024 report:

> A patient's risk level is directly tied to their clinical status. To construct a sound clinical risk formulation, treatment teams need access to information on the patient on several different areas. Therefore, the nature and frequency of a patient's communications with providers, behavior on the milieu, interactions with peer, level of involvement in group discussions, etc., are important sources of data that can provide relevant information on even nuanced aspects of the patient's inner state and psychiatric status. Mr. Reh's reluctance to full participate in his treatment leads to an incomplete clinical formulation, which has a similar effect on his risk formulation.

Nov. 2024 Report at 5. In other words, it is not that Whiting used group attendance or level of engagement as a *substitute* for an individualized clinical assessment; instead, Whiting used Reh's participation (or non-participation) in certain clinical activities as a *part* of his individualized clinical assessment. And Whiting found, in making that assessment, that Reh was not ready to be transferred to a less restrictive setting or to return to his prior PL. Sealed Gilbo Aff. ¶ 26.

The Decree does not empower the Court to second-guess the medical determinations of Whiting's clinicians, nor to substitute its own uninformed medical judgment for that of Whiting. *Cf. Siino v. City of New York*, No. 14-CV-7217 (MKB) (LB), 2020 WL 3807451, at *16 (E.D.N.Y. Feb. 27, 2020) ("[C]ourts should not substitute their untrained judgment for that of trained medical professionals who have diagnosed the plaintiff.") (collecting cases), *R. & R. adopted*, 2020 WL 1861865 (Apr. 14, 2020). The Decree provides that "[a]ll decisions concerning the care and treatment of PSRB patients shall be made on the basis of individual evaluations and assessments," Decree ¶ 11, but it does not prescribe what kind of medical information must be included or excluded in making that assessment. Thus, it was not a violation of the Decree for Whiting to consider Reh's participation in clinical activities in crafting his individualized assessment.

10

**Motion for Independent Psychiatric Evaluation**

On April 15, 2025, Reh filed a motion for an independent psychiatric evaluation pursuant to Federal Rule of Evidence 706. Mot. for Evaluation, ECF No. 252. In his motion, Reh asks for the Court to "[a]ppoint a qualified independent psychiatrist or psychologist, unaffiliated with the Connecticut Department of Mental Health and Addiction Services, to conduct a forensic psychiatric evaluation of Christopher Reh." *Id.* at 2. Defendants oppose the motion. Defs.' Obj., ECF No. 253.

Federal Rule of Evidence 706 provides that, "[o]n a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed," and "may appoint any expert that the parties agree on and any of its own choosing." Fed. R. Evid. 706(a). "The enlistment of court-appointed expert assistance under Rule 706 is not commonplace." *In re Joint E. & S. Dists. Asbestos Litig.*, 830 F. Supp. 686, 693 (E.D.N.Y. & S.D.N.Y. 1993). "The appointment of an expert witness pursuant to Rule 706 is not intended to aid litigants, but rather to aid the Court, through the services of an impartial expert, in its assessment of technical issues." *Williams v. City of Hartford*, No. 3:15-CV-933 (AWT) (SALM), 2016 WL 11637545, at *1 (D. Conn. May 16, 2016) (Merriam, J.) (quotations omitted). "Thus, the most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance." *Id.* (quotations omitted).

As discussed above, under the Decree, it is not for this Court to weigh in on the medical or psychiatric propriety of Reh's treatment plan. As it is not for this Court to decide, it is axiomatic that the appointment of an independent psychiatrist to aid in such an assessment is not necessary or appropriate. The motion to appoint an independent psychiatric expert is therefore DENIED.

11

**Conclusion**

As explained above, Movant Reh's Motion for Compliance is DENIED in its entirety. The Motion for Independent Psychiatric Evaluation is also DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of June, 2025.

                                                         */s/ Kari A. Dooley*
                                                       KARI A. DOOLEY
                                                       UNITED STATES DISTRICT JUDGE